IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

KERRY HOGLAND, individually and as
Guardian ad Litem for R.H., B.H. and H.T, minors,
and CHARLES HOGLAND                                      PLAINTIFFS

VS.                          CASE NO. 3:14-CV-00273-JTR

TOWN & COUNTRY GROCERS OF
FREDRICKTOWN MISSOURI, INCORPORATED                      DEFENDANT

### BRIEF IN SUPPORT OF MOTION IN LIMINE AND DAUBERT MOTION TO EXCLUDE TESTIMONY OF DR. IRMO MARINI, Ph.D.

### INTRODUCTION

This case stems from an auto accident that occurred on August 7, 2012 wherein separate plaintiff, Kerry Hogland, sustained a brain injury with a remarkable recovery. Ms. Hogland asserts a claim to recover for loss of earning capacity and the cost of future medical treatment(s). To address these claims plaintiffs have retained the services of a vocational rehabilitative counselor/life care planner, Dr. Irmo Marini, Ph.D. However, Dr. Marini's opinions do not satisfy the admissibility requirements of Federal Rule of Procedure 702 or Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

With regard to the purported future medical treatment, Dr. Marini is unqualified to testify on this issue because he is not a medical doctor, is admittedly unqualified to diagnose or treat medical conditions, and he has failed to have any physician (treating or non) validate or corroborate any of his recommended treatments. With regard to the purported loss of earning capacity, his opinions are pure speculation and contrary to the evidence in this case. The

undisputed evidence shows that Ms. Hogland returned to her pre-accident occupation as an ultrasound technician with NEA Baptist and is in no danger of losing her job.

## ARGUMENT

### A. Admissibility Standard

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. This rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2014). The Supreme Court in Daubert articulated exactly what this means, finding that expert testimony must be both reliable and relevant, requirements that apply to all experts testifying on any issue. Daubert, 509 U.S. at 591; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) (applying the Daubert analysis to all experts). The testimony must be based on scientific knowledge, grounded on the methods and procedures of science, and derived by the scientific method. Daubert, 509 U.S. at 590. It cannot be grounded only on the expert's own education, research, expertise, or qualifications, or his own assertions that he is an expert on the matter. *See, e.g.,* General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997) (finding that "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert"); Clark

2

v. Takata Corp., 192 F.3d 750, 759 n.5 (7th Cir. 1999) (noting that "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in Daubert."). In short, the testimony must be reliable as well as relevant for it to be admissible. *E.g.*, Daubert, 509 U.S. at 590.

The Court in Daubert listed five factors for determining reliability: (1) whether the theory or technique can be or has been subject to testing; (2) whether the theory has been published or subjected to peer review; (3) the theory or technique's known or potential rate of error; (4) the existence and maintenance of any standards controlling the technique's operation; and (5) whether the theory or technique is generally accepted in the relevant community, in this case, economics. Id. at 593–95. The district court's examination, however, is not limited to factors identified in Daubert. Id. at 593 (observing that the Court did "not presume to set out a definitive checklist or test" in setting forth the Daubert factors). Rather, scrutiny should be tailored to the "particular circumstances of the particular case at issue." Kumho, 526 U.S. at 150 (1999).

The United States Court of Appeals for the Eighth Circuit, for example, has also recognized that a district court can consider "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." Presley v. Lakewood Eng'g & Mfg. Co., 553 F.3d 638, 643 (8th Cir. 2009). Nevertheless, if a theory or technique cannot satisfy the Daubert factors, it is a strong indicator that it is unreliable and any testimony regarding it or results obtained from use it should be excluded.

**B. Dr. Marini is Unqualified to Render Opinions on Kerry Hogland's Future Medical Treatment**

When a plaintiff asserts a claim to recover for future medical treatment/expenses, expert testimony stated to a reasonable degree of medical certainty is always required. *See* West Union v. Vostatek, 302 Ark. 219, 222, 788 S.W.2d 952, 954 (1990)(stating with regard to future medical treatment that "[c]onsistent with the model instruction [AMI 2204], we have mentioned the showing of a 'degree of medical certainty' as evidence bolstering recovery of 'future medication'."); *see also* Willson Safety Products v. Eschenbrenner, 302 Ark. 228, 233, 788 S.W.2d 729, 733 (1990)(stating that future medical expenses are only recoverable "[w]here the doctor testifies that the injured party might need future treatment and the injured party testifies he still suffers pain...")(citing Williams v. Gates, 275 Ark. 381, 630 S.W.2d 34 (1982)); and Arthur v. Zearley, 337 Ark. 125, 143, 992 S.W.2d 67 (1999)(holding it is error to give a jury instruction on future medical treatment/expenses when no physician has testified that the treatment is needed). Absent competent medical evidence in the form of physician testimony supporting Dr. Marini's life care plan, his testimony is inadmissible speculation. *See* International Harvester Corp. v. Hardin, 264 Ark. 717, 574 S.W.2d 260 (1978)(reversing judgment against defendant where plaintiff's purported expert was unqualified and the testimony was nothing more than untried theory).

Dr. Marini has prepared a life care plan that identifies five treatment areas he believes Ms. Hogland will need in the future. *See* Ex. 1, pp. 16-20. Without going into the detail of each identified treatment, the fact remains that Dr. Marini is not qualified to render opinions on any recommended future medical treatment. Dr. Marini is not a medical doctor and admits he is not qualified to diagnose or treat medical conditions. *See* Ex. 2, pp. 11:16-25; 12:1-6. Dr. Marini

4

further admits he has not spoken with any of Ms. Hogland's treating physicians to validate or corroborate his recommendations. Id. at p. 63:14-19. In fact, Dr. Marini has never even reviewed a single medical record for Ms. Hogland. Id. at p. 66:19-23. He simply reviewed a medical summary that was prepared by plaintiffs' counsel and supplied to him. Id. at p. 64:3-15.

With the exception of a single anti-seizure medication prescribed by Ms. Hogland's neurologist[1], all of the treatments in Dr. Marini's life care plan are based on his unqualified opinion or the unqualified opinion of plaintiffs' retained neuropsychologist, Dr. Dan Johnson, Ph.D. However, like Dr. Marini, Dr. Johnson is not a medical doctor and is himself unqualified to render opinions on future medical treatment. The proposed life care plan and Dr. Marini's accompanying testimony clearly do not satisfy the requirements of Rule 702 and Daubert, nor does his testimony on future medical treatment satisfy the requisite of being proven to a "reasonable degree of medical certainty" through competent medical evidence. See West Union v. Vostatek, 302 Ark. at 222.

### C. Dr. Marini's Opinions on Kerry Hogland's Loss of Earning Capacity do not Satisfy the Requirements of Rule 702 or Daubert because they are Based on Speculation

There is no evidence to support Dr. Marini's contention that Ms. Hogland has suffered a loss of earning capacity as a result of the subject accident. He nevertheless prepared 4 separate scenarios that he believes Ms. Hogland could possibly encounter in the employment context. However, all of Dr. Marini's scenarios are just that – possibilities, not probabilities as required for

---

[1] Defendant concedes that Ms. Hogland's treating neurologist, Dr. Kenneth Chan, has testified that he believes Ms. Hogland should take an anti-seizure medication (Zonegran) for the foreseeable future. However, this is solely a preventative measure as Ms. Hogland has never suffered a seizure. Defendant is not challenging Dr. Marini's calculations of the cost of this medication over the course of Ms. Hogland's life.

evidence to be relevant and admissible. *See* Fed. R. Civ. P. 401 (2014).  In the interests of organization, each of Dr. Marini's scenarios will be taken up separately.

## SCENARIO 1

Dr. Marini's first scenario assumes that Ms. Hogland will remain employed at her current occupation as an ultrasound technician with NEA Baptist, but that Ms. Hogland will be limited to working 32 hours per week for the rest of her life as a result of the subject accident. *See.* Ex. 1, pp. 11-12.  Dr. Marini bases this assertion on a one hour interview with Ms. Hogland where she voiced her subjective concern that "she is not mentally or physically ready to go back to work five days a week but if financial reasons require her to do so, she will try." *See.* Ex. 1, p. 10; Ex. 2, p. 99:6-10.  Dr. Marini completely ignores the fact that Ms. Hogland is only working four days a week because she has to take off one day a week to take her son to and from Little Rock for leukemia treatment.  Dr. Marini ignores this fact even though he was fully aware of it and even referenced it in his report. *See* Ex. 1, p. 4.

There is also no issue of whether NEA Baptist would allow Ms. Hogland to return to work on a 40 hour per week basis.  Ms. Hogland's supervisor, Beverly Gober, testified  that Ms. Hogland is free to return to working 40 hours per week without any restrictions whenever she so desires. Ex. 3, pp. 15:3-22; 25:25; 26:1-2.  While defendant agrees that Ms. Hogland is unable to work on the day she travels to and from Little Rock, this has no causal relationship to the subject accident.  Dr. Marini's opinion is fatally flawed by following the logical fallacy of *post hoc ergo propter hoc. See* <u>Wirth v. Reynolds Metals Co.</u>, 58 Ark. App. 161, 163, 947 S.W.2d 401, 402 (Ark. App. 1997)(meaning "after this and therefore because of this").  Stated differently, the fact

that Ms. Hogland returned to work 32 hours per week after the accident does not mean that Ms. Hogland was/is only able to work 32 hours per week *because* of the accident.

In sum, it is Dr. Marini's opinion that Ms. Hogland will be limited to working 32 hours per week because that was Ms. Hogland's very loose subjective belief.  He admits that no doctor has ever stated that Ms. Hogland's condition renders her unable to work 40 hours a week, nor has any doctor stated that Ms. Hogland should have any form of work restrictions.  Ex. 2, pp. 15:18-25; 16:1; 99:11-15.  Dr. Marini is attempting to improperly bootstrap a loss of earning capacity claim solely off of Ms. Hogland's speculative and self-serving opinion. *See* United States v. Owens, 147 F. Supp. 309, 315, 1957 U.S. Dist. LEXIS 4243, 15 (E.D. Ark. 1957)(holding that a proper evidentiary showing is required and one cannot substitute "evidence, thus raising itself, so to speak, by its own boot straps"); and American Can Co. v. Pettyjohn, 258 Ark. 98, 101, 522 S.W.2d 358, 360 (1975)(holding that a declaration cannot be its own corroboration).  There must be some form of competent evidence showing an actual decrease in work ability to support a loss of earning capacity claim. *See* Gipson v. Garrison, 308 Ark. 344, 349, 824 S.W.2d 829, 832 (1992)(affirming a loss of earning capacity instruction where plaintiff was forced to forego her career as an interior decorator and liquidate her business); and Edwards v. Stills, 335 Ark. 470, 507, 984 S.W.2d 366, 385 (1998)(affirming a loss of earning capacity instruction where an attorney plaintiff stopped accepting criminal and domestic cases as a result of being kidnapped). There is no evidence to support Dr. Marini's opinion that Ms. Hogland is only capable of working 32 hours per week for the remainder of her life.  His testimony does not satisfy the requirements of Rule 702 or Daubert because his opinion is not based on reliable facts, but rather is based on unsubstantiated speculation.

SCENARIO 2

Dr. Marini's second scenario assumes Ms. Hogland loses her current job, is unable to find substitute employment as an ultrasound technician, and is relegated to working in an unskilled or semi-skilled profession (i.e. restaurant hostess, cash register operator, etc...). Ex. 1, p. 12. This scenario improperly assumes 1) Ms. Hogland is in danger of losing her job; and 2) she would only be able to find substitute employment in an unskilled or semi-skilled profession. There is simply no evidence to support this contention and all evidence is to the contrary.

We've deposed Ms. Hogland's supervisor and several of her coworkers. Every individual testified Ms. Hogland was a qualified and competent employee that was in no danger of losing her job. Beverly Gober is the Radiology Manager of NEA Baptist and is Ms. Hogland's direct supervisor. Ex. 3, pp. 6:23-25; 7:1-11. Ms. Gober initially testified that NEA Baptist is not in the process of laying off any employees in its radiology department, including ultrasound technicians such as Ms. Hogland. Id. at p. 11:11-23. Ms. Gober further testified there have been no discussions about possibly terminating Ms. Hogland, nor have there been any patient complaints regarding Ms. Hogland's work. Id. at pp. 12:7-12; 13:15-17. In addition, NEA Baptist has never placed any restrictions on Ms. Hogland's work or the amount of days per week she can work. At the time of Ms. Gober's deposition, Ms. Hogland was only working four days per week, which NEA was fine with accommodating, but Ms. Gobert testified that Ms. Hogland had the option to return to five days a week at anytime. Id. at p. 15:3-22. Ms. Gober further testified there have been no complaints regarding Ms. Hogland's ability to handle her patient load. Id. at pp. 25:25; 26:1-2. Finally, Ms. Gober testified that she views Ms. Hogland as a "good" employee who is competent to perform her job. Id. at p. 20:20-22.

In addition to Ms. Hogland's current supervisor, her former supervisor, Don Hubbard, also testified that he has no knowledge of Ms. Hogland being in danger of losing her job. Ex. 4, p. 18:2-8.   Mr. Hubbard has worked with Ms. Hogland since 2000 and testified that he noticed no issues with Ms. Hogland's ability to handle her patient load when she returned to work after the accident. Id. at p. 15:3-6.   The radiologist that Ms. Hogland has primarily worked with since 2005, Dan Mullen, also shared the opinion that Ms. Hogland was an adequate employee. Ex. 5, p. 31:1-10.

While defendant was not in possession of Ms. Hogland's performance evaluations at the time of the supervisor/co-worker depositions, those records have since been obtained.   Ms. Hogland has received two performance evaluations since the accident and in each evaluation she received a performance rating that "exceeds standards." *See* Ex. 6(a) – September 2014; 6(b) – August 2013. Ms. Hogland not only received ratings where she "exceeds standards" during each of the two post-accident evaluations, but she also received pay raises after each evaluation. Id. More importantly, both of Ms. Hogland's post-accident evaluations received the exact same performance rating that she received in her closest pre-accident evaluation. *See* Ex. 6(c) – October 2011.   This is certainly at odds with Ms. Hogland being in danger of losing her job or the claim that she has sustained a loss in earning capacity.

The sentiment that Ms. Hogland is a competent employee who is in no danger of losing her job was echoed by all of Ms. Hogland's co-workers. Jennifer Woolridge is an ultrasound technician at NEA Baptist who has worked with Ms. Hogland since 2007-2008.   Ms. Woolridge has never heard any complaints regarding the quality of Ms. Hogland's work and has always viewed her as a competent employee.   Ms. Woolridge further testified that she has never heard any indication that Ms. Hogland is in danger of losing her job. Ex. 7, pp. 12:13-25; 13:1-15.

Chelsea Denton is also an ultrasound technician at NEA Baptist who has worked with Ms. Hogland since 2012. Ms. Denton testified that she has no basis to criticize Ms. Hogland's work or Ms. Hogland's ability to perform her job. Ex. 8, pp. 16:14-16; 18:24-25; 19:1-4. Ms. Denton further testified that she has never heard anyone criticize Ms. Hogland's work or claim that Ms. Hogland was in danger of losing her job. Id. at pp. 19:11-20; 20:3-5. Crystal Young is a CT technician who has worked with Ms. Hogland since 2002 and testified she has never heard any complaints about Ms. Hogland's work performance, nor has she ever heard anyone indicate that Ms. Hogland is in danger of losing her job. Ex. 9, p. 12:2-16. Bill Louks is a CT technologist who has also worked with Ms. Hogland since 2002. Mr. Louks also testified he has never heard any indication that Ms. Hogland was in danger of losing her job. Ex. 10, p. 11:21-24.

Dr. Marini has never spoken with any of Ms. Hogland's co-workers or supervisors. Ex. 2, p. 16:20-24. He's never reviewed any of Ms. Hogland's performance evaluations. Id. at 68:23-25. He has no idea how ultrasound technicians are graded on performance at NEA Baptist, nor does he know how Ms. Hogland's performance compares with the other ultrasound technicians at NEA Baptist. Id. at 105:21-25; 106:1-2; 105:5-11. Without knowing any of this information, Dr. Marini still opines that Ms. Hogland will lose her job and ultimately be relegated to working in an unskilled or semi-skilled profession. When reviewing the record evidence, and after making every effort to reconcile it with Dr. Marini's opinions, it is clear his opinions are not based on reliable facts or methodology as required by Rule 702 and Daubert. Dr. Marini opining that Ms. Hogland will lose her job and be relegated to inferior employment is supported by nothing more than his own *ispe dixit*, wherein he attempts to validate this scenario solely on his own authority saying it's valid. See Coca-Cola Bottling Co. v. Gill, 352 Ark. 240, 263, 100 S.W.3d 715, 729 (Ark. 2003).

## SCENARIO 3

Dr. Marini's third scenario assumes Ms. Hogland will be in and out of the workforce throughout the remainder of her life and at some point will give up trying to find employment and remain unemployed. Ex. 1, pp. 12-13.  While this scenario differs from Scenario 2, it is still based on the faulty premise that Ms. Hogland will lose her job or that she is even in danger of losing her job.  For the reasons stated above, there is no evidence to support this assertion and it is nothing more than inadmissible speculation.


## SCENARIO 4

Dr. Marini's fourth and final scenario is the farthest reaching of them all.  In this scenario, Dr. Marini assumes that but for the subject accident Ms. Hogland would have moved to Memphis or Little Rock and obtained a higher paying job as an ultrasound technician in one of those markets.  There is no evidence Ms. Hogland was willing to (or ever even contemplated) moving to Memphis or Little Rock for any reason, much less for employment opportunities.  Dr. Marini readily admits he has no factual basis for this scenario.

In his deposition, Dr. Marini was asked if he had any evidence that Ms. Hogland was even willing to move to either of these Memphis or Little Rock.  Dr. Marini response was "No, I - - I actually never even asked her the question..." Ex. 2, p. 119:13-19. Rather, Dr. Marini included this in his report solely because he thought it was a "no brainer" that anyone would move to a bigger city to make more money. Id. at pp. 118:24-26; 119:1-12.  Dr. Marini admittedly does not put any consideration into the personal, social or familial aspects of an individual's decision on where to live, much less any consideration to how they would apply to Ms. Hogland. Id. at p. 120:5-12.  Dr. Marini certainly does not take into account that Ms.

Hogland was born, raised and has lived her entire life in Northeast Arkansas. Dr. Marini simply included this scenario because he believes anyone and everyone would move to a different location if it meant they would make more money.  This is another scenario based on nothing more than Dr. Marini's *ipse dixit*, where he asserts that Ms. Hogland would have moved to Memphis or Little Rock solely because he says she would have moved. *See* <u>Coca-Cola Bottling Co. v. Gill</u>, 352 Ark. 240, 263, 100 S.W.3d 715, 729 (Ark. 2003).


## CONCLUSION

Dr. Marini's opinions pertaining to Ms. Hogland's purported future medical treatment/expenses and her purported loss of earning capacity do not satisfy the <u>Daubert</u> or Rule 702 standards for admissibility and should be excluded. He is unqualified to render medical testimony and his employment scenarios are just speculation.

Respectfully submitted,

BARBER LAW FIRM, PLLC
Attorneys for Defendant
2700 Regions Center
400 W. Capitol Avenue
Little Rock, AR 72201-3414
(501) 372-6175

By___ /s/ Jonathan E. Baker_____
      Jonathan E. Baker      AR BIN 08232
      jbaker@barberlawfirm.com


&

CRAY, HUBER, HORSTMAN, HEIL
& VANAUSDAL, LLC
Attorneys for Defendant
303 West Madison, Suite 2200
Chicago, IL 60606
(312) 332-8450

By___ /s/ Stephen W. Heil_____
      Stephen W. Heil      ARDC 6204266
      swh@crayhuber.com


CERTIFICATE OF SERVICE

On this 16th day of March, 2015, a true and correct a copy of the above pleading was filed with the Court's CM/ECF system, which will send a copy of the foregoing to all attorneys of record.


      /s/ Jonathan E. Baker_____
      Jonathan E. Baker