## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## JONESBORO DIVISION

KERRY HOGLAND, et al.                                            PLAINTIFFS

VS.                          3:14CV00273 JTR

TOWN & COUNTRY GROCER
OF FREDERICKTOWN MISSOURI, INC.                                 DEFENDANT

## MEMORANDUM ORDER

### I. Introduction

This is a negligence action brought by Plaintiff, Kerry Hogland ("Hogland"), individually, and, as guardian *ad litem*, on behalf of her three minor children, against Defendant, Town & Country Grocer Of Fredericktown Missouri, Inc. ("Town & Country").[1] On August 7, 2012, Hogland and her three children were driving eastbound on Highway 412 East, in Lawrence County, Arkansas, when their vehicle was "broadsided" by a van owned by Town & Country. As a result of the accident, Hogland sustained a traumatic brain injury ("TBI").[2]

After undergoing surgery, hospitalization, and lengthy rehabilitation, Hogland was able to return to her job as an ultrasound technician. The level and

---

[1] In the parties' Pretrial Disclosure Sheets, they indicate that the claims of two of the minor children, R.H. and B.H., have been settled, leaving only H.T.'s claim for trial. *Docs. 46 and 48*.

[2] H.T., Hogland's son, also sustained injuries which required significant medical expenses. However, the current record does not describe the nature and extent of his injuries.

extent to which she will be able to continue to perform either her current job or any future work is hotly contested by the parties.[3]

Town & Country has admitted liability. *Doc. 19 at ¶5*. The case is scheduled for a jury trial, on August 10, 2015, on the only remaining issue — damages.

Town & Country has filed three separate motions seeking to exclude part or all of the testimony of three of Hogland's expert witnesses[4]: (1) Motion in Limine

---

[3] Charles Hogland divorced Kerry Hogland seven months after the accident. He originally asserted a loss-of-consortium claim. *Id. at ¶18-19*. On June 8, 2015, the parties filed a Stipulation of Dismissal, with prejudice, as to Charles Hogland's claim. *Doc. 44*.

[4] The admissibility of expert testimony is governed by Federal Rule of Evidence 702, as interpreted by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

*Fed. R. Evid.* 702. Under Rule 702, the Court must ensure that a proffered expert is qualified by his or her knowledge, skill, experience, training, or education before that person may testify as an expert. Additionally, the Court has a gatekeeping responsibility to ensure that expert evidence is both relevant and reliable before admitting it. *Daubert*, 509 U.S. at 589-91; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

Rule 702 requires that the proffered expert testimony relate to an issue in the case and be sufficiently tied to the facts of the case, *i.e.*, that the expert testimony is a proper "fit" for the case. *Daubert*, 509 U.S. at 591, 113 S. Ct. at 2795-96. The inquiry is "flexible" and focuses on the principles and methodology that the expert uses, and not on the conclusions generated. *Daubert*, 509 U.S. at 594-95. Four factors guide the Court's analysis: (1) whether the theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) in the case of a particular scientific technique, what the known or potential rate of error is and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory has received "general acceptance" in the relevant scientific community. *Id.* at 593-94.

The Court's role is not to determine whether an expert's opinion is correct. It is an expert witness's methodology, rather than his or her conclusions, that is the primary concern of Rule 702. *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001). "'[E]ven if the judge believes there are better grounds for some alternative conclusion, and that there are some flaws in the scientist's methods, if there are good grounds for the expert's conclusion it should be admitted . . . .'" *Id.* (quoting *Heller v. Shaw Indus.*, 167 F.3d 146, 152-53 (3d Cir. 1999)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

"Rule 702 favors admissibility if the testimony will assist the trier of fact, and doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998) (citation and quotation omitted). "Only if an expert's opinion is 'so fundamentally unsupported that it can offer no assistance to the jury' must such testimony be excluded." *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995) (quoting *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988)).

and *Daubert* Motion to Exclude Certain Testimony of Dan Johnson, Ph.D.; (2) Motion in Limine and *Daubert* Motion to Exclude Testimony of Dr. Irmo Marini, Ph.D.; and (3) Motion in Limine and *Daubert* Motion to Exclude Testimony of Dr. Lonnie Talbert, Ph.D. *Docs. 32, 34, and 36*. Hogland has filed Responses (*docs. 38-40*), to which Town & Country has filed Replies (*docs. 41-43*). Thus, all three of these Motions are joined and ready for disposition.

## II. Analysis

### A.    Town & Country's Motion in Limine and *Daubert* Motion to Exclude the Testimony of Dr. Dan Johnson

#### 1.    Dr. Dan Johnson's Treatment of Hogland's Brain Injury

Immediately after the accident, Hogland was taken to the Walnut Ridge ER; later moved to and stabilized at the St. Bernard's ER in Jonesboro; and then flown to the Regional Medical Center in Memphis, where she was diagnosed with: (1) bilateral fractures of the temporal bone; (2) a left subdural hematoma "which required a left frontal parietal craniectomy;" (3) intraparenchymal hemorrhage; and (4) an epidural bleed "requiring evacuation." *Doc. 36-1 at 1*.

On August 20, 2012, Hogland was discharged from the Regional Medical Center and admitted to the HealthSouth Rehabilitation Hospital in Jonesboro, Arkansas ("HealthSouth"). The Medical Director of HealthSouth, Dr. Terrence Braden, referred Hogland to Dr. Dan Johnson, a clinical neuropsychologist with a

Ph.D. in Applied Behavioral Studies from Oklahoma State University.[5] *Docs. 38 at 27, 36-2 at 13, 28.* Since 2001, Dr. Johnson has been in private practice in Jonesboro. *Id.* He is a licensed psychologist in Arkansas, but is not a medical doctor. *Doc. 36-2 at 12.*

On August 20, 2012, Dr. Johnson administered a battery of neuropsychological tests to Hogland.[6] According to Dr. Johnson, the test results "very much [were] in keeping with significant traumatic brain injury." *Doc. 36-3 at 77.*

Dr. Johnson next saw Hogland at his clinic, on December 7, 2012, where she underwent a "comprehensive out-patient neuropsych assessment." *Docs. 36-2 at 54, 36-3 at 76.* By that time, her attorneys had retained Dr. Johnson as an expert witness. *Doc. 36-2 at 54.* After the December 7, 2012 assessment, Dr. Johnson saw Hogland for "six brief follow-up exams" between January 31, 2013, and February 13, 2014. *Doc. 36-3 at 78.*

---

[5] Dr. Johnson also completed a post-doctoral fellowship in Clinical Neuropsychology at the VA in New Orleans. *Id.*

[6] These three tests were: (1) the Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS"); (2) a subtest of the Wechsler Memory Scale; and (3) a depression scale test. *Doc. 36-2 at 15-16.* On the RBANS, Hogland scored: (a) below the first percentile in "immediate memory," "delayed memory," "attention-concentration," and "basic language," all in the "severely impaired range;" and (b) in the thirtieth percentile of "visual spacial skills." *Docs. 36-2 at 32-37; 36-3 at 77.* Hogland was "oriented" on the Weschler Memory Scale and had "low moderate endorsements" on the depression scale. *Doc. 36-2 at 38-40.* Hogland reported "approximately 15-20 minutes of retrograde amnesia or loss of information/short term memory prior to traumatic brain injury ("TBI"). She "desrcibe[d] 'patchy] short term memory for several days post injury with consistent consolidated memory returning approximately 10 days post injury." *Doc. 36-3 at 69.*

4

In an undated report, prepared sometime in July of 2014, Dr. Johnson's "impressions" were as follows:

> Ms. Hogland experienced a severe traumatic brain injury on August 7, 2012 with significant neurological, physical, and emotional behavioral sequelae. In the 18 months following the traumatic brain injury the patient progressed from severely cognitive impaired, to noticeable cognitive decline/change, to achieving premorbid status across most functional domains, but certainly not all. Attention/concentration is vital to literally every aspect of day-today functional cognition and Ms. Hogland's continues to be problematic. The patient continues to be maintained on Dilantin secondly [sic] to 3 abnormal EEG's. Ms. Hogland's persistent mix of depressive-anxious range symptoms have continued and have a strong physiological/neurological underpinning. Similarly, the patient's physical malaise, tiredness, fatigue, poor mental stamina, and chronic low energy are very typical in post traumatic brain injury scenarios. The functional contrast between premorbid and current status is perhaps the most striking. Ms. Hogland premorbidly worked 40+ hours a week at two jobs with a high rate of proficiency, successfully parented and fully participated in the lives of her 3 children ages 2, 3, and 12, responsibly maintained physical household and household administrative tasks, and was very active/high energy physically — enjoying working out/exercising. At last interaction the patient had not been able to handle full time employment and was noticeably struggling to manage day-to-day demands and responsibilities — often times feeling and being overwhelmed both at work and in her personal life.
>
> At 18-24 months post-injury research in the field suggests that Kerry Hogland has likely experienced as much neurological healing/recovery possible and that remaining problematic domains represent residual sequela. Her remaining cognitive, physical, and emotional symptoms are significant, neurological-physiological sequela rooted in traumatic brain injury. These residual symptoms will continue to adversely impact her emotionally, physically, cognitively, vocationally, and personally going forward.
>
> The conclusions and professional opinions stated above are based on the clinical interview of the patient . . . an analysis of the current neuropsychological test results, and careful consideration of any and all medical/academic work records thus far available.

*Doc. 36-3 at 79-80.*

On August 23, 2014, Dr. Johnson saw Hogland for a "comprehensive neuropsychological examination similar to the one we did two years earlier [on

5

December 7, 2012]."[7] *Doc. 36-3 at 6*. The stated purpose for this second neuropsychological examination was to allow "a pre and post [treatment] comparison." *Doc. 36-3 at 6-7*. In a report, dated November 25, 2014 *(doc. 36-3 at 69-75)*, Dr. Johnson gave the following detailed "impressions" of Hogland's neuropsychological functioning, based on the results of the August 23, 2014 examination:

> Current neuropsychological testing suggests that Ms. Kerry Hogland has made significant improvements across most neurocognitive domains assessed since her last comprehensive neuropsych exam on 12/08/2014 [sic]. These improvements speak to the patient's high pre-morbid native intellectual ability and allows for a glimpse of how significant the adverse cognitive impact of her traumatic brain injury has been over the last two years. However, objective test findings do not always give full insight to the continued day-to-day ramifications of traumatic brain injury in high functioning adults and unfortunately such is the case with Ms. Kerry Hogland.

---

[7] The following appears to be the *actual timeline* of Dr. Johnson's examinations of Hogland: (1) on August 20, 2012, in an inpatient hospital setting, Dr. Johnson gave Hogland what he characterized as an "initial assessment," which involved him administering a battery of three tests (*doc 36-2 at 14*); (2) on December 7, 2012, Hogland came to Dr. Johnson's clinic where he administered an eight-hour "in depth comprehensive assessment" (*doc. 36-2 at 19, 54, 55, 60, 67*); (3) between December 8, 2012, and February 13, 2014, there were seven "brief follow up" appointments (*doc. 36-3 at 7, 69*);   and (4) on August 23, 2014, Hogland had a "follow up comprehensive exam." *Doc. 36-3 at 69.*

Against this backdrop, many of Dr. Johnson's reports and deposition testimony contain confusing errors with respect to Hogland's examination timeline. Dr. Johnson's July 2014 report erroneously states that Hogland had her first comprehensive out-patient neuropsych assessment on "12/08/12," (*doc. 36-3 at 76*) and then goes on to correctly state that her first "outpatient exam was on 12/07/12" *Doc. 36-3 at 77*. Dr. Johnson's November 25, 2014 report repeats the earlier erroneous statement that Hogland "presented for follow-up comprehensive out-patient neuropsych assessment on 12/08/2012." *Doc. 36-3 at 69.*

In Dr. Johnson's December 18, 2014 deposition, there is a badly confused exchange of questions and answers in which he testifies that, on August 23, 2014, he performed a "comprehensive neurological examination similar to the one we did two years earlier on 8-7-2012 [in fact the date of the accident]." *Doc. 36-3 at 6*. He goes on to state that he did the August 23, 2014 "comprehensive" examination to be "very commensurate" with the "fairly comprehensive examination in August of 2012." *Doc. 36-3 at 7*. Dr. Johnson's November 25, 2014 report also contains the *non sequitur* that "[c]urrent neuropsychological testing [from August 23, 2014] suggests that [Hogland has improved across most domains] *since her last comprehensive neuropsych exam on 12/08/14*." Doc. 36-3 at 73 (emphasis added).

Despite Dr. Johnson's many confusing and conflicting statements, the record when viewed as a whole, reflects that his two "comprehensive" examinations of Hogland occurred on *December 7, 2012, and August 23, 2014.*

Objective neurocognitive assessment tools suggest a significant difference between the patient['s] performance on verbally mediated tasks of overall cognition, typically associated more left hemisphere functioning vs. visually mediated tasks of overall cognition, typically associated with more right hemisphere functioning. Given the patient's left subdural hematoma which required a left frontal parietal craniectomy with evacuation of subdural hematoma, intraparenchymal hemorrhage, and epidural bleed requiring evacuation[,] residual decreased left hemisphere performance fits with the nature of her injury. The patient continues to display word finding/naming problems which are supported by objective testing, behavioral observation, and report[s] of co-workers. The left hemisphere is integral in the expressive speech process and was the hardest region hit in the traumatic brain injury. Executive functioning was noticeably less than optimal and stands in stark contrast to her other functional domains. Executive functioning is the one functional domain which does not appear to be improving, with current performances same or worse than those two years ago and is likely a major contributor to her day-to-day struggles.

Behaviorally, Ms. Hogland's deficits are unfortunately more than sum [sic] of her numbers. She continues to be overwhelmed easily and often both vocationally and personally. Kerry continues to display heightened emotionality. She is struggling to meet the minimum requirement at work. Her co-workers, manager, and collaborating physicians who know her pre and post traumatic brain injury universally talk about declines in quality of work, attention to detail, loss of confidence, emotional instability, problems multi-tasking, decreased decision making, and slowed processing speed. Her husband of 11 years details the changes in coping with stress, multi-tasking, and managing day-to-day living. He plainly attributes their divorce to the traumatic brain injury.

Based on current information, Ms. Hogland's vocational prognosis following her significant traumatic brain injury is likely to be poor. Based on feedback from her closest colleagues, it is universally agreed that Ms. Hogland is currently struggling to meet minimal requirements at her job. Her collaborating physician rated her premorbidly to be a "10"on a scale of 1-10 and currently places her performance as a "5," which suggests that even with her proficiency on exam room cognitive measures that improvement is [sic] not translating to job performance. The change over at her place of work to a new system has been very difficult for her, which demonstrates poor adaptive capacity. To be blunt, it appears Ms. Hogland is likely by in large trading on the good graces of her co-workers based on friendship, likability, and past positive history. As Ms. Hogland's current vocation struggles continue, as they have despite neurological improvement, the probability of her losing her current job increases exponentially. If Kerry loses her current job, the likelihood to her landing a commensurate job position elsewhere is doubtful.

*Doc. 36-3 at 73-74.*[8]

Dr. Johnson's November 25, 2014 report also states his opinion that Hogland's "current neurocognitive and psychological difficulties" were caused by the August 7, 2012 accident: "Based on the available medical records, clinical interview, neurocognitive test findings, psychological results, patient report, and behavioral observations, couched in terms of reasonable medical certainly [sic], I would consider there to be a direct and causal relationship between Ms. Hogland's current neurocognitive and psychological difficulties and the MVA which occurred on 08/07/2012." *Doc. 36-3 at 74.*

## 2. Dr. Johnson's Five Recommendations Regarding Hogland's Future Treatment And Needs

Dr. Johnson also gave five "recommendations" to conclude his November 25, 2014 report:

l. Given the extent of Ms. Hogland's behavioral symptoms secondary to TBI she will *likely benefit* from individual cognitive behavioral therapy weekly for the [sic] at least six months (or longer depending on efficacy), twice a month for at least a year, and once a month thereafter.

2. In junction [sic] with individual counseling, Ms. Hogland will *likely require* psychotropic medication evaluation/treatment on a monthly basis for the next year and every 2-3 months thereafter.

3. Ms. Hogland *could benefit* from cognitive therapy from [a] speech pathologist to assist in expressive speech, organization, planning, implementation, and reasoning skills - once every two weeks for 9 months and once a month thereafter.

---

[8] Dr. Johnson was deposed on July 30, 2014, after he issued his first July 2014 report, and again on December 18, 2014, after he issued his November 25, 2014 report. *Docs. 36-2, 36-3.*

4. Given Ms. Hogland's fragile vocational status, vocation rehabilitation assessment is also *likely indicated*.

5. By all accounts, in her post-TBI condition Ms. Hogland is increasingly struggling to meet the demands of work and home with conditions as they are currently. As her parent's or child's medical conditions worsen, she *will require* in-home assistance in order to manage.

The conclusions and professional opinions stated above are based on the clinical interview of the patient (and significant others, if present during evaluation), an analysis of the current neuropsychological test results, and careful consideration of any and all medical/academic/work records thus far made available.

*Doc. 36-3 at 74-75* (emphasis added).

These five "recommendations," along with Dr. Johnson's opinion on causation, are the subject of Town & Country's Motion in Limine and *Daubert* Motion to Exclude portions of Dr. Johnson's anticipated trial testimony. In its motion papers, Town & Country argues that: (1) Dr. Johnson does not state his five recommendations to the degree of certainty required under Arkansas law; (2) he is not qualified to render these recommendations or his opinion on causation; and (3) he has not provided a sufficient foundation for any of his recommendations or his opinion on causation.[9]

The Court will first address Town & Country's arguments on whether there is a sufficient foundation for Dr. Johnson's five specific recommendations stated in his November 25, 2014 report, and whether Dr. Johnson is qualified to render

---

[9] Town & Country does not challenge Dr. Johnson's opinions based on Hogland's scores on the various neuropsychological tests he administered. *Doc. 37 at 2.*

those recommendations. It will then consider whether Dr. Johnson should be allowed to express an opinion on "causation."

**(a).   Cognitive Behavioral Therapy**

Dr. Johnson states that "[g]iven the extent of Ms. Hogland's behavioral symptoms secondary to TBI she will likely benefit from individual cognitive behavioral therapy weekly for the [sic] at least six months (or longer depending on efficacy), twice a month for at least a year, and once a month thereafter." *Doc. 36-3 at 74*. In his December 18, 2014 deposition, Dr. Johnson testified that cognitive behavioral therapy involved: "talk therapy . . . discuss[ing] cognitive mind sets . . . [y]ou would also discuss some behavioral techniques, for example, decreasing anxiety, deep breathing exercises, biofeedback, systematic desensitization to things that are anxiety provoking." *Doc. 36-3 at 49-50*.

He recommends that Hogland undergo cognitive behavioral therapy based on "[p]redominantly [the] clinical interview, the nature of this injury, the associated sequelae of the injury, her self report, [and] the report of those around her." *Doc. 36-3 at 51*. According to Dr. Johnson, "cognitive behavioral therapy is very proactive and matches [Hogland's] level of cognitive functioning." *Doc. 36-3 at 49*. When asked whether a psychiatrist or psychologist would provide the therapy, Dr. Johnson testified that "typically" a psychologist would do so. *Doc. 36-3 at 49*.

10

Town & Country concedes that Dr. Johnson "may . . . be remotely qualified" to recommend cognitive behavioral therapy insofar as he is a neuropsychologist, but, because he "admits that he does not provide [cognitive behavioral therapy], and he would refer [Hogland] to another provider [for the therapy]," he is not qualified to make such a recommendation. *Doc. 37 at 8-9*. Town & Country *cites no legal authority* to support its argument that Dr. Johnson, a neuropsychologist, is not qualified to recommend cognitive behavioral therapy (which unquestionably is a neuropsychological treatment), simply because, as part of his neuropsychological practice, he does not provide that treatment himself.

"Rule 702 only requires that an expert possess 'knowledge, skill, experience, training, or education' sufficient to 'assist' the trier of fact, which is 'satisfied where expert testimony advances the trier of fact's understanding to any degree.' Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Robinson v. GEICO General Ins. Co*., 447 F.3d 1096, 1000 (8th Cir. 2006) (internal citations omitted) (holding that a neurologist, despite not being an orthopedist, was qualified to testify as to the cause of the plaintiff's shoulder problems, which was "within his realm of expertise" as a neurologist and physician). Based on Dr. Johnson's education, training, and experience, the Court concludes that he is qualified to make the

recommendation that Hogland "will likely benefit from individual cognitive behavioral therapy" from a qualified psychologist who provides such therapy.[10]

In his December 18, 2014 deposition, Dr. Johnson testified that "cognitive behavioral therapy, by research, proves to be most effective." *Doc. 36-3 at 49*. When asked to explain the "research you're talking about," Dr. Johnson answered: "[a]n omnibus of research over the last 15 years, you kind of . . . you go to conferences and you read and you google. I'm not referencing a specific article." *Doc. 36-3 at 63*. Based on this answer, Town & Country argues the only foundation for Dr. Johnson's opinions are his "say-so."[11] In support of its argument, Town & Country relies on *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").[12]

In general, "[a]ttacks on the foundation for an expert's opinion, as well as the expert's conclusions, go to the weight rather than the admissibility of the expert's testimony." *Sphere Drake Ins. PLC v. Trisko*, 226 F.3d 951, 955 (8th Cir.

---

[10] The fact that Dr. Johnson does not provide cognitive behavioral therapy to his patients is of no real relevance to the issue of whether he is qualified to recommend that she receive this therapy.

[11] Defense counsel did *not* ask Dr. Johnson to identify the "conferences" or books or treatises he "read" that support his opinion that "cognitive behavioral therapy, by research, proves to be most effective." In the face of *no follow-up questions by defense counsel*, to clarify specifically what Dr. Johnson was referring to as support for his opinion, his answer, standing alone, cannot fairly be construed to mean that he "fail[ed] to reference specific articles," which reduced the foundation of his opinion to mere "say-so."

[12] In *Joiner*, the Court also noted that "abuse of discretion" was the standard of review applicable to a district court's decision to admit or exclude expert evidence. *Joiner*, 522 U.S. at 139.

2000); *see also Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.").

In his December 18, 2014 deposition, Dr. Johnson explained why he thought cognitive behavioral therapy would likely benefit Hogland. He made it clear that his recommendation for cognitive behavioral therapy was based on "[p]redominantly [the] clinical interview, the nature of this injury, the associated sequelae of the injury, her self report, [and] the report of those around her." *Doc. 36-3 at 51*. This record, combined with Dr. Johnson's training and experience in neuropsychology, establishes a sufficient foundation for his opinion.

Finally, Town & Country argues that Dr. Johnson does not state his recommendation for cognitive behavioral therapy to the required degree of certainty. Specifically, it argues that: (1) Dr. Johnson's opinion that Hogland would "likely benefit" from the therapy is insufficient; and (2) his opinion impermissibly lacks any "time-based limitations on the treatment."[13] *Doc. 37 at 17-19*.

Under Arkansas law, "[f]uture medical expenses do not require the same degree of certainty as past medical expenses." *Matthews v. Rodgers*, 279 Ark. 328,

---

[13] Town & Country goes on to restate this same argument, as to all five of Dr. Johnson's recommendations, based on the alleged lack of certainty surrounding each recommendation.

651 S.W.2d 453 (1983). In *Matthews*, the appellee underwent abdominal surgery for a shotgun wound. At trial, his doctor testified that "[f]uture plastic surgery or skin grafts might be required for scar revision." *Id.* at 335, 457.  The doctor's testimony that future surgery "might" be required, in addition to the appellee's testimony that "he still had pain in the area," was held to be sufficient to allow that testimony to go to the jury as an element of damages.

Similarly, in *Willson Safety Products v. Eschenbrenner*, 302 Ark. 228, 788 S.W.2d 729 (Ark. 1990), the appellee suffered a jaw injury and underwent several pre-trial surgeries with only temporary pain relief. At trial, an oral surgeon testified "that an experimental surgical procedure . . . might benefit the appellee . . . and would likely have to be repeated on an annual basis." *Id.* at 233, 733. The Arkansas Supreme Court held that this testimony created a "jury-submissible issue" on the possible need for the surgery as a future medical expense: "Where the doctor testifies that the injured party might need future treatment and the injured party testifies he still suffers pain, that testimony is sufficient for the consideration of the element of future medical expenses." *Id.*

While these cases allowed expert testimony to be admitted on a patient's need for future medical treatment, because it "*might*" be necessary, more recent decisions by Arkansas appellate courts have held that expert testimony about future medical treatment must establish that the need for that treatment is "*likely*" or

14

"*probable*" in order for the testimony to be admitted into evidence. In *Jacuzzi Brothers, Inc. v. Todd*, 316 Ark. 785, 875 S.W.2d 67 (1994), the Court held that it was error for the trial court to allow a neurosurgeon to testify to "a thirty percent chance of requiring a future surgery" because it was not "the most likely result and therefore constitutes speculative evidence."[14]

In *E-Ton Dynamics Indus. Corp. v. Hall*, 83 Ark. App. 35, 115 S.W.3d 816 (2003), the Court followed *Jacuzzi Brothers* and found that it was error for the trial court to allow an orthopedic surgeon to testify that a future surgery "could" be required.[15] According to the Court, "[t]o be admissible, an expert's opinion must represent his professional judgment as to the most likely or probable result." *E-Ton Dynamics*, 115 S.W.3d at 819. The Court concluded that the orthopedist's testimony that the appellee "may require future surgery, which he could not predict with any degree of certainty, is speculative and therefore inadmissible."[16] *Id.*

---

[14] In *Jacuzzi Brothers*, the neurosurgeon testified that: (1) there was a thirty percent chance that the appellee would require a future orthopedic surgery; (2) the appellee was at an "increased risk of needing surgery" due to his size; and (3) "whether appellee would require the surgery at all was speculative."

[15] In *E-Ton Dynamics*, the surgeon testified that: (1) the appellee's toes on her right foot had been traumatically amputated in an accident and could not be reattached; (2) due to the appellee's young age at the time of the injury, the bones where her toes were amputated "could continue to grow under the skin of her foot;" (3) "[i]f that were to occur revision surgery . . . would be conducted to remove the protruding bone;" (4) he "can't tell . . . whether it will happen or whether it won't happen;" and (5) he planned to have her return to see him every two to three years to check for bone overgrowth because it was a "realistic risk."

[16] In a recent decision by United States District Judge Kristine G. Baker, she followed *E-Ton Dynamics* but "acknowledg[ed] that there is some dispute under Arkansas law as to what degree of medical certainty is [required] to demonstrate the need for future medical expenses":

[Plaintiff] will continue to need some medical treatment in the future for the injuries sustained in connection with this accident. The Court will award [plaintiff] some damages for future medical treatment. "It is not speculation or conjecture to calculate future medical expenses based upon the history of medical expenses that have accrued as of the trial date, particularly when there is also a degree of medical certainty that future medical expenses will be necessary. Future medical expenses do not require the same degree of certainty as past medical expenses." *Willson Safety Prods. v. Eschenbrenner*, 302 Ark.

Because Dr. Johnson states that Hogland will "*likely benefit*" from cognitive behavioral therapy, the Court concludes that his recommendation "represent[s] his professional judgment as to the most likely or probable result," *i.e.*, Hogland "will likely benefit from individual cognitive behavioral therapy for the [sic] at least six months (or longer depending on efficacy), twice a month for at least a year, and once a month thereafter." *See Jacuzzi Brothers and E-Ton Dynamics, supra.*[17]

Accordingly, Town & Country's Motion in Limine and *Daubert* Motion are denied as to Dr. Johnson's first recommendation in his November 25, 2014 report.

### (b).   Hogland's Need for Future Treatment with Psychotropic Medications

In Dr. Johnson's July 2014 report, he notes that "Hogland's persistent mix of depressive-anxious range symptoms have continued and have a strong physiological/neurological underpinning." *Doc. 36-3 at 79.* In his November 25, 2014 report, he states that Hogland "will likely require psychotropic medication evaluation/treatment on a monthly basis for the next year and every 2-3 months thereafter." *Doc. 36-3 at 75.*

---

228, 233, 788 S.W.2d 729, 733 (1990) (internal citations omitted). This Court acknowledges that there is some dispute under Arkansas law as to what degree of medical certainty is necessary to demonstrate the need for future medical expenses. *See E–Ton Dynamics Indus. Corp. v. Hall*, 83 Ark.App. 35, 39–40, 115 S.W.3d 816, 819 (2003). Here, the Court determines the threshold has been met to award such damages based on [plaintiff's] own testimony and his medical records in evidence.
*Cary v. United States*, 2013 WL 4496362, *5 (E.D. Ark. Aug. 20, 2013).

[17] *See also Trubey v. Gray*, 2002 WL 704713, *3-5. (Ark. App. April 24, 2002) (unpublished). In *Trubey*, the trial court granted plaintiff's motion for new trial because the jury awarded damages only for past medical expenses, and ignored "overwhelming evidence" of other elements of damage, including future medical expenses. The Arkansas Court of Appeals affirmed, noting that plaintiff's treating physician testified that she would "*likely require* future medical treatment in the form of physical therapy, medication, and doctor's visits." *Id.* (emphasis added).

16

When Dr. Johnson was deposed and asked about this recommendation, he explained that: "My research suggests that . . . the use of psychotropic medications, typically anti-anxiety, anti-depression medication, has the highest rate of . . . effectiveness in treatment." *Doc. 36-3 at 52*. He gave examples of drugs like Lexapro, Xanax, and Cymbalta as being appropriate to deal with Hogland's anxiety and depression. *Id.* He also made it clear that his recommendation was for Hogland to "see[] a psychiatrist or a physician who prescribes those medicines on a monthly basis to make sure that the medication prescribed is working, is effective at the dose it is working, etc." *Doc. 36-3 at 52-53*.

Town & Country argues that Dr. Johnson is not qualified to testify regarding Hogland's future needs for psychotropic medication because he is not a medical doctor and he cannot prescribe medication.[18]   It also argues that Dr. Johnson's opinion regarding psychotropic medications lacks a sufficient foundation because, in his deposition, he could not "reference specific research to support this opinion," and his "so-called research is nothing more than Dr. Johnson's say-so[.]"*Doc. 37 at 10*.

For her part, Hogland emphasizes Dr. Johnson's experience as a psychologist "with a wide and varied background, including in hospital settings

---

[18] Other than citing the Arkansas statute that defines the practice of psychology, Town & Country cites *no legal authority* to support its position that a neuropsychologist is not qualified to recommend that a patient needs psychotropic medication.

and working with physicians," including neurologists. *Doc. 38 at 11-13, 15*. She contends that the "experience-based analysis should prevail[.]"[19] *Doc. 38-at 11*.

While neuropsychologists are not medical doctors and do not prescribe medication, the Arkansas legislature has defined the "practice of psychology" to include "[d]iagnosis and treatment of mental and emotional disorders, that consist of the appropriate diagnosis of mental disorders, behavior disorders, and brain dysfunctions, according to standards of the profession and the ordering or providing of treatments according to need." Ark. Code Ann. § 17-97-102(a)(2)(B)(i) (Repl. 2010). Based on Dr. Johnson's education and training, and his deposition testimony about his experience as a neuropsychologist, the Court concludes that there is a sufficient foundation to allow him to testify about his second recommendation that Hogland "likely [will] require psychotropic medication evaluation/treatment on a monthly basis for the next year and every 2-3 months thereafter."[20]

---

[19] "Experience-based expert testimony is reliable if the expert explains how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Vesey*, 338 F.3d 913, 917 (8th Cir. 2003) (*quoting* Advisory Committee Note to Fed. R. Evid. 702) (internal quotations and alterations omitted).

[20] *Cf. Porter v. Holton*, 2015 WL 1191220 (Ky. Ct. App. Mar. 13, 2015) (unpublished) (holding under state law that a psychologist was qualified to testify that a criminal defendant would benefit and regain competency from forced anti-psychotic medications) (unpublished); *Blackmore ex rel. JS v. Astrue*, 2010 WL 2674594 (D. Me. June 29, 2010) (unpublished) (social security disability appeal — "While Dr. Claiborn could not prescribe medication, I discern no reason why, as a psychologist, he was unqualified to assess whether the child's ADHD symptoms were of greater or lesser severity during times that the record indicated she was taking or not taking prescribed medication."); *compare with Henry v. County of San Mateo*, 2004 WL 201504 (N.D.Cal. 2004) (unpublished) (psychologist was not qualified to testify that decedent's prescription for prozac breached the standard of care and caused the decedent's suicide).

Finally, Town & Country argues that Dr. Johnson's recommendation regarding psychotropic medication lacks the required degree of medical certainty because: "(1) it is uncertain as to necessity; and (2) is uncertain as to timing." *Doc. 37 at 19*. To the contrary, Dr. Johnson explicitly states that Hogland "will likely require psychotropic medication evaluation/treatment," which is sufficient to meet the standard for admissibility articulated by the Court in *Jacuzzi Brothers and E-Ton Dynamics*. As to timing, Dr. Johnson made it clear that Hogland would need "medication evaluation/treatment [by a psychiatrist] on a monthly basis for the next year and every 2-3 months thereafter."

Accordingly, Town & Country's Motion in Limine and *Daubert* Motion are denied as to Dr. Johnson's second recommendation in his November 25, 2014 report.

### (c).   Speech Therapy

The third recommendation in Dr. Johnson's November 25, 2014 report is that "Hogland *could benefit* from cognitive therapy from [a] speech pathologist to assist in expressive speech, organization, planning, implementation, and reasoning skills - once every two weeks for 9 months and once a month thereafter." *Doc. 36-3 at 75* (emphasis added). In his December 18, 2014 deposition, Dr. Johnson testified as follows when asked why he thought Hogland "*could benefit*" from seeing a speech pathologist:

Her word findings skills are not optimal. When you're talking about organization, planning, implementation, reasoning, that results to that executive functioning tasks. Speech pathology often times goes above and beyond simple, expressive speech and they do — they work with executive functioning and other cogni-tasks, running the patient through drills, if you will, that will help improve or design to at least stabilizer out those areas of deficit or need.

*Doc. 36-3 at 53*. When asked if speech pathology was "more to keep [Hogland] at the current level rather than improvement," Dr. Johnson answered: "Theoretically. I mean, there *could be improvement from that. I'm not — again neurologically she's as healed as she's gonna get.*" *Doc. 36-3 at 54* (emphasis added).

Town & Country restates it earlier arguments that Dr. Johnson is not qualified to recommend speech pathology, because he is not a speech pathologist, and his opinion lacks a sufficient foundation. Town & Country also points to Hogland's deposition testimony that she last received speech therapy *in 2012. Doc. 36-4 at 97*.

In her Response, Hogland asserts that "Dr. Johnson knows that speech therapy is a key to treating executive functioning problems." *Doc. 38 at 17*. She also submits materials from outside of the record to support her position: printouts from various general-information websites that discuss "executive functioning," speech pathology, and neuropsychology. *Doc. 38 at 39-48*. In her view, those website printouts establish a "firm basis for Dr. Johnson's opinions," because "the

link is clear between speech therapy and neuropsychological injury." *Doc. 38 at 17.*

It is widely known that traumatic brain injuries can affect speech and word recognition. As a neuropsychologist, Dr. Johnson is familiar with the sequelae of traumatic brain injuries, one of which frequently involves altered speech and poor word recognition. Dr. Johnson is not required to be a speech pathologist to express his expert opinion, as a neuropsychologist, that Hogland "could benefit" from seeing a speech pathologist. Similarly, his education, training, and experience as a neuropsychologist provides a sufficient foundation for him to make this recommendation.

The real problem with Dr. Johnson's third recommendation does *not* arise from his lack of qualifications to make that recommendation or an insufficient foundation to support his opinion. It arises from the equivocal language he uses in making the recommendation. According to Dr. Johnson, Hogland "*could*" benefit from speech therapy. In *E-Ton Dynamics*, the Court made it clear that, in offering testimony about "future medical expenses," "an expert's opinion must represent his professional judgment as to the *most likely* or *probable result*." *See E-Ton*, 115 S.W.3d at 819 (emphasis added). By opining only that Hogland "could benefit" from seeing a speech pathologist in the future, Dr. Johnson's recommendation "is

speculative and therefore inadmissible."[21] *See E-Ton Dynamics*, 115 S.W.3d at 819.

Finally, Hogland last received speech therapy *in 2012*, and Dr. Johnson *admits* in his deposition that she is neurologically "as healed as she's gonna get." Those two facts may well explain why he chose to use the phrase "could benefit" in making his third recommendation.[22]

Thus, Town & Country's Motion in Limine and *Daubert* Motion are granted and neither Dr. Johnson's third recommendation in his November 25, 2014 report nor any testimony about that recommendation will be admitted into evidence at trial.

### (d).   Vocational Rehabilitation Assessment

Dr. Johnson's fourth recommendation is that Hogland undergo a vocational rehabilitation assessment because he believes, at some indefinite future date, she will be unable to perform her current job as an ultrasound technician. To place this

---

[21] During Dr. Johnson's December 18, 2014 deposition, Hogland's attorneys did *not* ask him any questions on direct examination to try to rehabilitate his *equivocal opinion* that Hogland "could benefit" from future cognitive therapy from a speech pathologist. Had they done so, and *if* Dr. Johnson had, for example, testified that he misspoke or used the wrong qualifying word and what he, in fact, meant to say was that it was "probable" or "likely" that Hogland would benefit from "cognitive therapy from a speech pathologist," this might have allowed his third recommendation to be admitted into evidence. However, none of those questions were asked, and now, less than sixty days before trial, Dr. Johnson's opinion that Hogland "could benefit" from future speech therapy is fixed and unalterable. Thus, it is *far too late* for Hogland's counsel to request an evidentiary hearing for the purpose of having Dr. Johnson give a *new and different opinion,* which presumably would be that he now believes it is "likely" or "probable" she would benefit from "cognitive therapy from [a] speech pathologist ..."

[22] By not giving an end date for this recommended speech therapy, it appears Dr. Johnson believes it should continue at least for the remainder of Hogland's work life. *See doc. 36-3 at 54* ("Q: . . . once every two weeks for nine months and once a month thereafter, until when? A: Again, theoretically, indefinitely."). By admitting there is a "theoretical" aspect to how long Hogland may need this speech therapy, he reinforces the inherently speculative nature of this recommendation.

recommendation in context, it is important to understand Hogland's vocational history.

Since September of 2001, she has worked primarily as an ultrasound technician, while also administering x-rays and other types of imaging. She has performed all of this work as an employee of what is now NEA Baptist in Jonesboro. *Doc. 36-4 at 53*. Before the accident, she also performed ultrasound work, on an after-hours basis, at the Five Rivers Medical Center. *Id. at 54*.

On February 27, 2013, seven months after the accident, Hogland returned to her job at NEA Baptist. *Doc. 34-6 at 3*. She began by working only one half-day (four hours one day a week) through the "first week in March 2013 . . . [before] increasing to two half days a week [8 hours], followed by 1 ½ days a week [12 hours], and three full days by September 2013 [24 hours]. In January [2014], she returned to four days per week [32 hours]." *Docs. 36-4 at 57, 34-1 at 8*. Since the accident, Hogland has not performed any after-hours work at Five Rivers. *Doc. 36-4 at 62*.

In April of 2014, Hogland took three months of family medical leave because one of her sons was diagnosed with leukemia. *Docs. 36-4 at 61, 34-3 at 10*. Hogland's supervisor, Beverly Gober ("Gober"), was deposed on October 15, 2014. She testified that Hogland "was off work [on family medical leave] for about three months . . . then she came back one day a week because of [her son's]

treatments[.]" *Doc. 34-3 at 10*. Hogland resumed her four-day-a-week schedule some time in September 2014.[23] *Id.*

On May 19, 2014, Hogland was deposed. She testified that she could not work more than thirty-two hours a week due to "mental fatigue, and just my whole, I guess, thinking process . . . I just feel like a struggle through a lot of days at work." *Doc. 36-4 at 70*. She also described having a hard time keeping up with her schedule and staying on time, and with the "whole work process . . . the whole re-thinking everything process." *Doc. 36-4 at 76-77*. At the time of her deposition, Hogland was using the one day a week she did not work to drive her son to Little Rock for weekly chemotherapy treatments. *Doc. 36-4 at 22*. Finally, Hogland stated that, she had once planned to obtain additional ultrasound specializations or "registries," but, after the accident, she thought that she could no longer pass those tests. *Doc. 39 at 53*.

Dr. Jeff Mullen is a radiologist. He has worked closely with Hogland, both before and after the accident, and has "oversight over her quality of work." *Doc. 39 at 60*. In his deposition, he stated that, after the accident, "there's a difference in her [Hogland's] [work] abilities[.]" *Doc. 39 at 59*. "That specifically would be her ability with the scans themselves, but more importantly, her ability to handle

---

[23] The report of Hogland's vocational expert, Dr. Marini, suggests that Hogland returned to work, on a 32-hour a week schedule, some time in June of 2014, rather than September of 2014. *Doc. 34-1 at 8*. Between now and trial, counsel should stipulate to the interval of time that Hogland has worked 32-hours a week as an ultrasound technician at NEA Baptist. The answer to this question is important to the calculation of damages and it is difficult to see how it could be a disputed matter.

24

stressful situations — either difficult cases or multiple cases at one time or anything that causes more stress in our day[.]" *Doc. 39 at 60*. Before the accident, Dr. Mullen described Hogland as being "one of the better" ultrasound techs that *he* had ever worked with at any time. After the accident, he testified that she struggles to be in the top half of the ten ultrasound techs that were currently working with Dr. Mullen. *Doc. 39 at 69*.

Dr. Mullen also noted that, since the accident, she is "flustered or stressed about things a lot easier," and has "trouble articulating[.]" *Doc. 39 at 62*. He "equate[d] this somewhat to like early a [sic] Alzheimer's phase, the patient's knows something's wrong and they know that they can't remember things that they should, which makes them more stressed. . . I see that sometimes with her . . . she'll get flustered about that." *Doc. 39 at 63*. It was Dr. Mullen's "personal opinion [that] she is capable of performing adequately on a limited basis." *Doc. 39 at 65*.

Gober is the radiology manager at NEA Baptist and, since January of 2014, she has been Hogland's supervisor. *Doc. 34-3 at 2-3*. In her deposition, Gober stated that she had no plans to downsize the number of ultrasound techs at the hospital. *Doc. 34-3 at 4*. If positions were eliminated, performance evaluations and seniority would be used to determine which employees would be terminated. *Doc. 34-3 at 5*. She admitted to hearing complaints about Hogland's performance from other staff, "just personal complaints about attitude and emotional issues . . . how

25

emotional she is . . . she changes almost like she'll be happy one minute and yelling at you the next." *Doc. 34-3 at 5.* After Hogland's accident, Baptist Memorial acquired NEA. According to Gober, Hogland had trouble learning the new policies and procedures, and got very frustrated and upset. *Doc. 39 at 77.* Gober characterized Hogland as "an emotional wreck" on the anniversary of the accident. *Doc. 39 at 79.*

Gober was told by Dr. Mullen that the quality of Hogland's performance was not as good as it was pre-accident. *Doc. 34-3* at 6. No one at NEA Baptist has told Gober that they want Hogland terminated, and "we've just done further training trying to help." *Id.* at 6. Gober thought that Hogland was "a good employee; I think she's competent to do her job." *Doc. 34-3* at 8.

Don Hubbard is the "radiology business manager" at NEA Baptist who was Hogland's former supervisor. *Docs. 39 at 83, 35 at 9.* Once Hogland came back to work four days a week, he did not see her having problems doing her eight to ten scans a day. *Doc. 34-4 at 2.* However, Dr. Mullen told Hubbard that, post-accident, the quality of the scans she performs is "not what it was before the accident." *Id. at 2.* The only problem Hubbard had with Hogland, before the accident, was her becoming confrontational, "almost to the point of crossing the line a few times." *Doc. 34-4 at 3.* Since the accident, "she cries at the drop of a hat." *Doc. 39 at 88.* He described Hogland as a "self-starter" before the accident, and "not so much

after." *Doc. 39 at 84*. Hubbard thought "layoffs [were] coming" to the ultrasound techs at NEA Baptist because it was running in the red. *Doc. 39 at 89-91*. He was informed that, if layoffs came, they will be based on performance. *Doc. 39 at 91*.

Chelsea Denton is an ultrasound tech at NEA Baptist and one of Hogland's co-workers. *Doc. 39 at 95*. According to Denton, after the accident, Hogland's personality changed, and she lacked confidence. *Doc. 39 at 97*. "She has a hard time finding the words," and cries often and is now upset at work more. *Doc. 39 at 98-99*.

Hogland's September 30, 2011 "employee evaluation" reflects that her "overall performance" "exceeds standards" and she was noted to have "[e]xceptional technical knowledge and problem solving . . . exceptional ultrasound skills, works well with little to no supervision." *Doc. 34-6 at 9-10*.

*After the August 7, 2012 accident*, Hogland's next "employee evaluation" was on July 30, 2013. This evaluation reflects that her "overall performance" "exceeds standards" and she was noted as a "top performer, excellent technical skills, definite asset to company." *Doc. 34-6 at 6-7*. A November 25, 2013 "employee evaluation" reflects that her "overall performance" "exceeds standards." *Doc. 34-6 at 4-5*. Another "employee evaluation," apparently prepared on September 24, 2014,  indicates that, "during 2013," Hogland "exceeds standards"

27

and is a "good employee, [with] excellent technical skills." *Doc. 34-6 at 1-2.*
Hogland received hourly pay raises in both 2013 and 2014.

Suffice it so say, Hogland's consistently high scores on these *post-accident*
"employee evaluations" are hard to square with the testimony of Dr. Mullen,
Gober, Hubbard, Denton, and Hogland, herself.[24]

In his November 25, 2014 report, Dr. Johnson opined that Hogland's
"vocational prognosis following her significant traumatic brain injury is likely to
be poor." In support of his opinion, he wrote the following:

> The patient continues to display word finding/naming problems which are
> supported by objective testing, behavioral observation, and report[s] of co-
> workers. The left hemisphere is integral in the expressive speech process and was
> the hardest region hit in the traumatic brain injury. Executive functioning was
> noticeably less than optimal and stands in stark contrast to her other functional
> domains. Executive functioning is the one functional domain which does not
> appear to be improving, with current performances same or worse than those two
> years ago and is likely a major contributor to her day-to-day struggles.

> *Behaviorally, Ms. Hogland's deficits are unfortunately more than sum [sic] of her*
> *numbers. She continues to be overwhelmed easily and often both vocationally and*
> *personally. Kerry continues to display heightened emotionality. She is struggling*
> *to meet the minimum requirement at work. Her co-workers, manager, and*
> *collaborating physicians who know her pre and post traumatic brain injury*
> *universally talk about declines in quality of work, attention to detail, loss of*
> *confidence, emotional instability, problems multi-tasking, decreased decision*
> *making, and slowed processing speed. Her husband of 11 years details the*
> *changes in coping with stress, multi-tasking, and managing day-to-day living. He*
> *plainly attributes their divorce to the traumatic brain injury.*

> *Based on current information, Ms. Hogland's vocational prognosis following her*
> *significant traumatic brain injury is likely to be poor. Based on feedback from her*
> *closest colleagues, it is universally agreed that Ms. Hogland is currently*

---

[24] In his November 25, 2014 report, Dr. Johnson *speculates* that these discrepancies may be explained by
Hogland "trading on the good graces of her co-workers based on friendship, likability, and past positive [work]
history." *Doc. 36-3 at 74.* At trial, the Court will *not* permit such speculation by Dr. Johnson or any other expert
witnesses.

*struggling to meet minimal requirements at her job. Her collaborating physician rated her premorbidly to be a "10" on a scale of 1-10 and currently places her performance as a "5," which suggests that even with her proficiency on exam room cognitive measures [of] that improvement is [sic] not translating to job performance. The change over at her place of work to a new system has been very difficult for her, which demonstrates poor adaptive capacity. To be blunt, it appears Ms. Hogland is likely by in large trading on the good graces of her co-workers based on friendship, likability, and past positive history. As Ms. Hogland's current vocation struggles continue, as they have despite neurological improvement, the probability of her losing her current job increases exponentially. If Kerry loses her current job, the likelihood to her landing a commensurate job position elsewhere is doubtful.*

Doc. 36-3 at 74 (emphasis added).[25]

In his December 18, 2014 deposition, Town & Country's attorneys asked Dr. Johnson the following questions about his opinion as to Hogland's "vocational prognosis":

> Q. Okay. And then the next paragraph says she continues to be overwhelmed easily and often both vocationally and personally. That came from your interview with her?
> A. And with my review of the depositions.
> Q. Okay. Kerry continues to display heightened emotionality. Did that come from your review of the depositions and your interview with Kerry?
> A. Yes, the combination of both.
> Q. Okay. She is struggling to meet the minimum requirement at work. Where did you get that?
> A. From her deposition and from my clinical interview with her.
> Q. Okay. Do you know what she means by she's struggling to meet the minimum requirement?
> A. She's--in our discussions, she's talking about doing basic tasks and things that she used to be able to "do in her sleep" be able to very professionally [sic] at. But now these very basic things are becoming and have been very difficult for her to just do basic tasks, not above and beyond type of things, just rudimentary tasks. And then, in the depositions, I read similar type of statements from her coworkers and colleagues.
> Q. Did you ever review any of her employment records?
> A. In terms of?

---

[25] Dr. Irmo Marini, Hogland's vocational rehabilitation and life-care planning expert, adopts the emphasized portion of Dr. Johnson's report, as the "most applicable ["future neuropsychological probable prognosis" for Hogland] and he uses that prognosis to support almost all of his "vocational and life care planning opinions[.]" *Doc. 34-1 at 12.*

Q. Her job performance?

A. No. No.

Q. Did you review any performance evaluations that she's undergone since being at NEA Baptist Clinic and NEA Baptist Hospital?

A. Not to my knowledge.

Q. It states, her coworkers, manager and collaborating physicians who know her pre and post traumatic brain injury universally talk about declines in quality of work, attention to detail, loss of conscious--confidence, emotional instability, problems multi-tasking, decreased decision making and slowed processing speed. There you're referring to the depositions?

A. I am.

Q. And you did not personally talk to any of those individuals, did you?

MR. DREYER: Asked and answered.

A. No, sir.

MR. HEIL CONTINUING:

Q. Okay. And then it says her husband of 11 years details the changes in coping with stress, multi-tasking and managing day-to-day living. He plainly attributes their divorce to the traumatic brain injury. Did you see--does Kerry attribute the divorce between her and Chuck to the brain injury?

A. I don't know.

Q. Did you ever review any of the divorce proceedings or files in the divorce proceedings?

A. No.

Q. And do you know why they got divorced?

A. I do not.

Q. Okay. You state in the next paragraph, based on current information, Ms. Hogland's vocational prognosis following her significant traumatic brain injury is likely to be poor. What current information are you referring to?

A. When you look at how much she has recovered cognitively over the last two years and you compare that to how poorly she is doing at work, that paints a very unfortunate picture.

Q. And when you say how poorly she's doing at work, you're relying upon the depositions you read?

A. I am.

Q. Okay. You say her vocational prognosis. Do you mean her ability to work in that same position?

A. I do.

Q. You're not a vocational rehabilitation expert, are you?

A. No, sir.

Q. Okay. You state her collaborating physician rated her pre-morbidly to be a 10 on a scale of one to 10 and currently places her performance at a five, which suggests that even with her proficiency in exam room cognitive measures had improvements--improvement is not translating to job performance. Are you referring there to Dr. Mullen?

A. I am.

Q. Okay. Do you know whether Dr. Mullen evaluates Kerry on a yearly basis?

30

A. I'm unfamiliar with that process.

Q. It notes near the end of that paragraph, as Ms. Hogland' s current vocation struggles continue as they have despite neurological improvement, the probability of her losing her current job increases exponentially. Are you assuming, Dr. Johnson, that Kerry's vocational struggles, as you outlined above, will continue in that therefore the probability of her losing her job increases?

A. That is correct.

Q. Would you agree that, if her vocational struggles no longer continue, the job-- the possibility or probability of her losing her job decreases exponentially?

A. The possibility. [sic] if she starts to perform much better at work. would [sic] certainly decrease the possibility.

Q. Okay. And then it says, if Kerry loses her current job, the likelihood to her landing a commensurate job position elsewhere is doubtful. What do you base that on?

A. If you look at the best producer of future performance is past performance and you see how much she's struggling now at nice scores cognitively for the most part, her confidence is a significant issue, and she lacks it significantly as talked about in the deposition. That ability will carry over to her capacity to land a job of similar position and recommendations from her fellow colleagues. I would again, it is an assumption but they would call around and say how does Ms. so and so do? And they said well, you know, she did okay but now we had to let her go because of x, y or z. I don't see that being a positive for her landing a job of similar stature.

Q. You don't have any evidence, do you Dr. Johnson, that Kerry's in jeopardy of losing her current job?

MR. DREYER: I'll object to the extent it's over broad and vague.

A. Specifically, I do not know that. Based on the depositions, though, it does seem as though that her deficiencies are clearly noted by everybody in her vocational life, which, to me, would be distressing and a sign of perhaps things to come.

MR. HEIL CONTINUING:

Q. But you don't have any evidence, as you sit here today, that she is at a threat of losing her job, correct?

MR. DREYER: Same objection, it's being ambiguous and it's argumentative.

A. No more than what I've already stated.

MR. HEIL CONTINUING:

Q. Okay. And likewise, even if she were to lose her job, it would still be your opinion that the likelihood of finding a commensurate job would be doubtful?

A. Correct.

Q. Based solely on her co-employees testimony and Dr. Mullen?

MR. DREYER: I'll object that it's argumentative and misstates his testimony.

MR. HEIL CONTINUING:

Q. Go ahead.

A. Okay. Based on, again, it's this idea that she's improved so much neurologically and yet her day to day performances keep sliding and is not up to par, that is the distressing factor here, that the numbers would suggest that she

could perform well at work and she's trying so hard. There's no evidence that she's, you know, doing anything but an effort and it's not working. That is the combination of those two factors combined with her depositions of her coworkers combined with actually her good test scores, that's what's distressing.

Q. Okay. Do you base that statement that the likelihood of her landing a commensurate job elsewhere is doubtful on anything other than what you just mentioned?

A. No.

*Doc. 36-3 at 42-48.*

On direct, Hogland's counsel asked the following questions to Dr.

Johnson about his "vocational" opinions:

Q. Dr. Johnson . . . Mr. Heil asked you a lot of different questions concerning your opinions, and, for example, one was dealing with your opinions regarding your thoughts relative to her vocationally and her job and your sense of her struggles there. As a--as a basis of your opinion, you articulated on question from Mr. Heil the historic information you got, that is, the depositions you reviewed, her coworkers, her supervisors, Dr. Mullen talking with her. Those are factual aspects of things that you've reviewed that form a basis for your opinion, I take it?

A. That is correct.

Q. The testing data, that you described with Mr. Heil relative to how she did on her cognitive testing and are proven over time juxtaposed to how she's doing actually functionally, that's also a basis of your opinion?

A. That is correct.

Q. Is it, and maybe this is just presumed because of who you are and what you do, but is also a function of a basis for your opinion as it relates to these vocational topics, for example, are you also relying upon your background and your experience as a neuropsychologist?

A. I am.

Q. And in terms of your background in that regard, this circumstance where you have somebody who has a traumatic brain injury of the severity of Ms. Hogland's, who is high functioning and working, have you followed folks in terms of how it affected them vocationally?

A. I have.

Q. And is that also serving as a basis for your opinions that you're providing to Mr. Heil and to us, relative to what you think's going to happen with this young lady?

A. Very much so.

Q. All right. And as a neuropsychologist, you understand how people like lawyers, jurors, anybody for that matter, might look at the empirical data, see that she's doing well or high superior, that sort of thing, on her testing, and have

difficulty understanding how it is then that it impacts—the brain injury still impacts her life.
A. Yeah.
Q. You understand that contrast?
MR. HEIL: Object to form, foundation, broad.
You can answer it.
MR. DREYER CONTINUING:
Q. Let me just--let me do a better job asking you the question. You testified as to how she's improved with time from this brain--this traumatic brain injury, true?
A. Correct.
Q. Can someone just rely upon the empirical test data to tell how the person is going to do in the real world?
A. Absolutely not.
Q. Okay. Is that, again, as with everything else you talked about your opinions, is that not only based upon your research and data but also based upon your background, your experience as
a treating neuropsychologist?
A. That is correct.
Q. And, in fact, all these opinions you've provided that are written and that you provided Mr. Heil as basis, another basis of your opinion, is it your background and experience as a neuropsychologist dealing with a traumatic brain injury victim?
A. It is.

*Doc. 36-3 at 64-66.*

In Dr. Johnson's November 25, 2014 report, he opined that: "[g]iven Ms. Hogland's fragile vocational status, vocation rehabilitation assessment is also likely indicated." *Doc. 36-3 at 75*. In his December 18, 2014 deposition, he offered the following testimony to support his opinion that Hogland needs to have a vocational rehabilitation assessment, *in anticipation of her losing or not being able to perform her current job*:

Q: And what do you mean by vocation rehabilitation assessment is indicated?
A: As I, you know, as stated in the report, there's . . . a very unfortunate trend to where she's improving neurologically but her day to day carry over is, does not seem to be very much. When she loses her job, that kind — I don't believe she'll be able to go back to a similar position. She may need vocational counseling to

retool towards another type of position that better suits her post traumatic brain injury status.

Q: The need for vocational rehabilitation assessment assumes that she will lose her job, correct?

A: Or that she becomes very dissatisfied with her job by virtue of her poor performance and pressure to achieve what she's unable to achieve.

Q: And until one of those two things happens, there's really no need to vocation rehabilitation assessment, correct?

A: To some extent. However, there's the idea of being proactive in treatment in terms of not waiting until a patient is in crisis or has lost her job, but assisting them to what options are out there. Some people try to hang on to a position which they're unable to do, and it drives their level of quality of life functioning distress through the roof. Knowing what options are out there might be beneficial in the future.

Q: But this vocation rehabilitation assessment is to either retrain her to do something else in the event she loses her job or becomes so frustrated she quits the job?

A: The initial part of that is to assess even what she's qualified to do, if that scenario were to occur.

Q: And you don't do a vocation rehabilitations assessment, do you?

A: No, sir.

Q: You're not a vocation rehabilitation expert, are you?

A: No, sir.

*Doc. 36-3 at 55-56.*

Town & Country argues that Dr. Johnson is unqualified to recommend that Hogland receive a vocational rehabilitation assessment because he admits he is not a vocational rehabilitation expert. It also argues that his recommendation lacks any foundation because: (1) Dr. Johnson admits he did not review any employment records, was not familiar with Hogland's post-accident employee evaluations, and did not personally speak with any of her colleagues at work; (2) Hogland has received favorable post-accident job evaluations; and (3) Hogland is currently employed. According to Town & Country, a "[v]ocational rehabilitation [assessment] is unnecessary, and permitting Dr. Johnson to testify that it is likely

indicated is in direct contradiction to the undisputed, overwhelming evidence in this case. *Doc. 37 at 11-12*. Finally, Town & Country argues that this recommendation by Dr. Johnson is not "reasonably certain" and therefore inadmissible because:

> As before, Dr. Johnson opines that this care is "likely indicated." There is not certainty. There is no probability of the necessity. Rather, Dr. Johnson testified that, in his opinion, the necessity for this depends on either: Ms. Hogland losing her job, which lacks evidentiary support as she is not under threat of losing her job; or as proactive measure, Ms. Hogland becomes very dissatisfied with her job due to her performance and pressure, which also lacks evidentiary support. Unless one of those two instances occur, Dr. Johnson's recommendation would not even come into play. Thus, the fact finder is left to speculate as to Ms. Hogland's employment status, and then speculate as to whether a vocational rehabilitation assessment is, in fact, indicated.

*Doc. 37 at 21.*

Hogland defends Dr. Johnson's qualifications to express an opinion on Hogland's need for a vocational rehabilitation assessment "based on his background in neuropsychology, and dealing with clients who face difficulties in the work setting due to traumatic brain injury." *Doc. 38 at 18*. She goes on to argue that, if the Court will conduct a *Daubert* hearing:

> Dr. Johnson will testify that his opinions and recommendations [about vocational rehabilitation] are regularly sought from workers' compensation insurance companies. These insurers specifically rely upon Dr. Johnson as the 'gold standard' for issues pertaining to return to work in cases involving neurological injury or compromise.

*Doc. 38 at 20.* She also argues that Town & Country has mischaracterized the evidence and ignores deposition testimony from various witnesses, including

Hogland and her co-workers, that symptoms of Hogland's TBI have hurt and will continue to hurt her job performance.

Based on his education, training, and experience as a neuropsychologist, Dr. Johnson clearly is qualified to opine on how the sequelae of a TBI manifest themselves in the workplace and whether those sequelae are consistent with the problems Hogland is encountering at work: (1) reduced ability to handle stress; (2) emotional lability; (3) word confusion; (4) problems in multi-tasking; (5) decreased decision making and confidence; and (6) decreased speed in "processing," sometimes requiring repetition of tasks.

Importantly, Dr. Johnson has *not* opined as to *when* Hogland will lose or quit her job. However, he believes her "vocational prognosis [in her current job] . . .is *likely* to be poor." *Doc. 36-3 at* 74 (emphasis added). His opinion is supported by testimony from Hogland, Dr. Mullen, Gober, and Denton; his own personal experiences dealing with other patients who have suffered traumatic brain injuries; his review of medical literature addressing problems faced by workers with traumatic brain injury; and the specific symptoms he has observed in Hogland, which indicate her ability to perform her job is declining.

Thus, the Court concludes there is a sufficient foundation to support Dr. Johnson's opinion that Hogland's poor vocational prognosis in her current job justifies her receiving a vocational rehabilitation assessment. While Dr. Johnson

cannot give a specific date when Hogland will lose her current job, he believes it is "likely" and he provides specific facts (including the testimony of Hogland and her co-workers) to support his opinion. Admittedly, there is some uncertainty surrounding if or when Hogland loses her job. However, Dr. Johnson's opinion is that the "likelihood" she loses or quits her job is sufficiently high to justify her receiving a vocational rehabilitation assessment. Thus, the Court concludes his opinion is not so "speculative" as to make it inadmissible in evidence. It will be up for the jury to resolve the many questions surrounding if or when Hogland loses her current job.

Town & Country has advanced many good arguments that undermine various aspects of Dr. Johnson's testimony, but all of those arguments go the *weight* to be assigned Dr. Johnson's opinion that a "vocational rehabilitation assessment" is "likely indicated" for Hogland — even though she continues to hold her job as an ultrasound technician.[26] None of those arguments go to the *admissibility* of Dr. Johnson's opinions, all of which are supported by sufficient evidence in the record. Dr. Johnson's general experiences as a neuropsychologist, his specific experience treating Hogland and administering neurological testing

---

[26] For example, Hogland and her co-workers have testified that she continues to face serious difficulties at work due to her TBI. That testimony certainly is in conflict with Hogland's good to excellent post-accident job evaluations, which were based on Hogland working *32 hours per week*. It also arguably conflicts with certain deposition testimony from other ultrasound and CT technicians at NEA Baptist — Jennifer Woolridge, Crystal Young, and William Loucks — who have not noticed any deficiencies in Hogland's post-accident work and did not know anything about Hogland being in jeopardy of losing her job. *Docs. 34-7, 34-9, 34-10.*

over a period of several years, and his reliance on the testimony of Hogland and her co-workers, all combine to provide an adequate foundation to support his opinion that a vocational rehabilitation assessment is "likely indicated," even though Hogland continues to be able to perform her job as an ultrasound technician. Finally, Dr. Johnson made it clear that, *at this time,* he believes a vocational rehabilitation assessment is "likely indicated." This opinion meets the required degree of certainty specified in *E-Ton and Jacuzzi Brothers* standard of his professional judgment as the "most likely" or "probable result."

Thus, Town & Country's Motion in Limine and *Daubert* Motion are denied as to Dr. Johnson's fourth recommendation in his November 25, 2014 report.

### (e).   In-Home Assistance

In Dr. Johnson's November 25, 2014 report, he states that: "By all accounts, in her post-TBI condition Ms. Hogland is increasingly struggling to meet the demands of work and home with conditions as they are currently. As her parent's or child's medical conditions worsen, she will require in-home assistance in order to manage."[27] *Doc. 36-3 at 75.*

---

[27] Hogland's mother has ALS (*doc 36-4 at 14*), which is a progressively degenerative condition that is fatal. As indicated earlier, one of her children has leukemia, which Hogland describes as "in remission." *Doc. 36-4 at 19*. It also appears that Hogland's father (who is divorced from her mother) has mental health problems. Hogland described those problems as "bipolar disorder . . . or manic depression," or possibly schizophrenia. *Doc. 36-4 at 127*. In Dr. Johnson's opinions, Hogland's parents' and child's medical conditions will worsen in the future; however, the facts that may support that opinion are not in the record now before the Court.

In his December 18, 2014 deposition, Dr. Johnson explained that "by [Hogland's] account she's having difficulties managing her basic day-to-day home administrative tasks, things that she needs to do for her family. . . [s]he presented as an over arching type  of construct, meaning, basically, across the board she's barely keeping her head above water, so to speak, and becomes very emotional when she talks about that." *Doc. 36-3 at 56*. Dr. Johnson also was asked whether it was his opinion that Hogland "requires in-home assistance to help manage her parents [or son] if they worsened versus she needs [in-home assistance] because of a brain injury?" Dr. Johnson answered:

> [T]hat's a complex question. Her brain injury, from my perspective, has significantly compromised her capacity to deal with stress. The stress of a sick child, the stress of a sick mother, a father with issues, divorce, these things, her capacity to adjust, adapt, deal, overcome, compensate for those stressful issues, has been significantly diminished by the traumatic brain injury.

Doc. 36-3 at 57.

Town & Country argues that, by recommending in-home assistance, Dr. Johnson has "suggest[ed] that Ms. Hogland is disabled" and "stepped into the shoes of a physician" beyond his qualifications. *Doc. 37 at 8*. Town & Country also characterizes Dr. Johnson's recommendation as "contingent on matters unrelated to the subject incident (i.e., the health of Ms. Hogland's parent or child)" and therefore lacking in foundation. *Doc. 37 at 12* (emphasis in original). Finally, Town & Country argues that this recommendation by Dr. Johnson is not

sufficiently certain because it is contingent on the worsening health of Hogland's family members. *Doc. 37 at 22*.

Hogland argues that Dr. Johnson is qualified to recommend in-home assistance based on his "perspective as a neuropsychologist." *Doc. 38 at 21*. As a foundation for Dr. Johnson's opinion, Hogland cites her deposition testimony that she "[doesn't] always communicate well . . . I can't always say what I want to say or, you know, come up with the words I want to say, which gets very frustrating and it gets me upset." *Doc. 36-4 at 133*. According to Hogland, her brain injury has diminished her ability to deal with stress, both at work and at home. *Doc. 38 at 21*.

Contrary to Town & Country's argument, Dr. Johnson is not opining that Hogland is "disabled" or offering a medical opinion that she is restricted from work. As a neuropsychologist, Dr. Johnson is an expert in the area of TBI sequelae, and can testify how those sequelae impact a person's ability to respond to stress, and limit his or her ability to run a household. At trial, Town & Country can cross-examine Dr. Johnson about his opinions on the need for Hogland to have in-home assistance, based on her TBI, and whether those opinions are contingent on "unrelated matters."[28] However, nothing in Town & Country's arguments go to the

---

[28] Town & Country seems to have forgotten that it must accept Hogland, who was injured by *its negligence*, as it finds her. She has a child who was diagnosed with cancer, after the accident, and both of her parents have serious medical challenges. Hogland contends she can no longer provide: (1) the daily care her children need (including the child who has cancer); and (2) the care her ailing parents require. Town & Country's counsel should proceed at his own peril in trying to argue to the jury that "the heath of Ms. Hogland's parent or child" are "unrelated matters."

*admissibility* of Dr. Johnson's opinion on Hogland's need for in-home assistance. Finally, Dr. Johnson's recommendation that Hogland "will require in-home assistance" is stated to the requisite degree of certainty required to satisfy *Jacuzzi Brothers and E-Ton Dynamics.*

Thus, Town & Country's Motion in Limine and *Daubert* Motion are denied as to Dr. Johnson's fifth recommendation contained in his November 25, 2014 report.

### (f).   Causation

In Dr. Johnson's November 25, 2014 report, he express the following opinion on the cause of Hogland's "current neurocognitive and psychological difficulties":

> Based on the available medical records, clinical interview, neurocognitive test findings, psychological results, patient report, and behavioral observations, couched in terms of reasonable medical certainly [sic], I would consider there to be a direct and causal relationship between Ms. Hogland's current neurocognitive and psychological difficulties and the MVA which occurred on 08/07/2012.

Doc. 36-1 at 6.

Town & Country contends that Dr. Johnson is not qualified to opine on causation, and that his opinion lacks foundation:

> Without knowledge regarding Ms. Hogland's pre-morbid status, by Dr. Johnson's own admission, he lacks foundation to opine on causation. Even though he is not a medical doctor, Dr. Johnson attempts to opine `couched in terms of reasonable medical certainly [sic].' This is improper. Since Dr. Johnson is not a medical doctor, he is unqualified to opine to any degree of medical certainty, and he surely cannot testify to causation of Ms. Hogland's <u>medical</u> condition. More importantly, without foundational knowledge of Ms. Hogland's pre-morbid status drawn from objective sources, and without the required medical background, Dr.

41

Johnson is not in a position to opine regarding causation to a reasonable degree of medical certainty.

*Doc. 37 at 13* (emphasis in original).

Hogland responds that Dr. Johnson "will testify that he used standard neuropsychological testing batteries, and he formed his opinions from those standardized tests." *Doc. 38 at 22*. She also disputes Town & Country's characterization of Dr. Johnson as having no knowledge of her "pre-morbid status." Dr. Johnson's first undated report reflects Hogland's pre-accident medical history, which was essentially unremarkable.[29] *Doc. 36-3 at 70*.

Neither party has cited *any legal authority* to assist the Court in deciding if a neuropsychologist may opine on whether a traumatic brain injury was caused by an accident. While there appear to be no Arkansas or Eighth Circuit cases on point, "[o]ther jurisdictions analyzing this issue under various analogs to [Rule 702] have not required specific qualifications in determining the etiology of brain injuries before allowing psychologists or neuropsychologists to testify in this regard." *Bennett v. Richmond*, 960 N.E.2d 782, 790 (Ind. 2012) (citing cases); *Huntoon v. TCI Cablevision*, 969 P.2d 681, 690 (Colo. 1998) (rejecting a categorical rule that neuropsychologists may not opine as to causation because they are not

---

[29] Among other things, Hogland reported that she had no history of head injuries. *Doc. 36-3 at 70*. She did report a "history of some counseling for mixed depressive/anxious range symptoms with trial of mild anti-depressants for brief [sic] period of time." *Id.*

medical doctors — "The majority of jurisdictions . . . have found that neuropsychologists may, with the proper foundation, opine on the physical cause of organic brain injury.") (*citing cases*); *compare with   Martin v. Benson*, 125 N.C. App. 330, 336-37, 481 S.E.2d 292, 296 (N.C. Ct. App. 1997) (reviewing the state statutory definitions of "psychology" to conclude "that the practice of psychology does not include the diagnosis of medical causation."), *rev'd on other grounds*, 348 N.C. 684, 500 S.E.2d 664 (1998).

There can be no dispute that Hogland was involved in a serious motor vehicle accident on August 7, 2012; the accident was caused by Town & Country's negligence; and Hogland suffered significant brain injuries, which required hospitalization, major surgery, and rehabilitation. Dr. Johnson evaluated her, in a treating capacity, only two weeks after the accident. According to his undated report (*doc. 36-3 at 70*), her pre-accident medical history was *unremarkable*, with no reported history of any head injuries and one brief interval of taking a mild anti-depressant for symptoms of depression and anxiety. Finally, Dr. Johnson has continued to follow her in multiple examinations.

Given these facts, the Court concludes that, as a neuropsychologist, Dr. Johnson is qualified to render the opinion that "there [is] a direct and causal relationship between Ms. Hogland's current neurocognitive and

psychological difficulties and the MVA [motor vehicle accident] which occurred on 08/07/2012." The Court further concludes that there is a sufficient foundation to support Dr. Johnson's opinion that Hogland's TBI and its resulting sequelae were caused by the August 7, 2012 motor vehicle accident. See *Bennett, supra,* 960 N.E.2d at 790; *Huntoon, supra*, 969 P.2d at 690.

Accordingly, Town & Country's Motion in Limine and *Daubert* Motion to exclude Dr. Johnson's opinion on causation are denied.

### B.    Town & Country's Motion in Limine and *Daubert* Motion  to Exclude the Testimony of Dr. Irmo Marini

#### 1.    Background Relevant to Considering Dr. Marini's Expert Testimony

Dr. Irmo Marini has a Master of Arts, with a major in clinical psychology from Lakehead University in Canada. *Doc. 40 at 56*. He has a Doctor of Philosophy, with a major in rehabilitation, from Auburn University. *Id.* He is also a certified life care planner, a certified rehabilitation counselor, and a registered forensic vocational expert. Since 1990, Dr. Marini primarily has worked as an expert witness preparing vocational assessments or life-care plans for lawyers. *Doc. 34-2 at 2*. He also has been a vocational expert in more than 5,000 social security disability hearings. *Doc. 34-2 at 6*.

In December of 2014, Dr. Marini prepared a "Life Care Plan and Vocation[al] Analysis." *Doc. 34-1*. Dr. Marini's plan relies on, among other things: (1) his November 16, 2014 interview of Hogland; (2) a 72-page summary of Hogland's medical records provided by her attorneys; (3) a review of the deposition transcripts of Hogland and her co-workers and supervisors; and (4) a consultation with Dr. Johnson, and a review of Dr. Johnson's "final report . . . dated August 23, 2014."[30] *Doc. 34-1 at 4-5; 34-2 at 9.*

Town & Country argues that: (1) Dr. Marini's Vocational Analysis is inadmissible because it is based on speculation; and (2) Dr. Marini's Life-Care Plan is inadmissible because he is not qualified to opine on future medical treatment.  The Court will address each of Town & Country's arguments below.

### 1.    Dr. Marini's Vocational Analysis

In pertinent part, Dr. Marini's Vocational Analysis states the following:

> Ms. Hogland and Dr. Johnson in his neuropsychological report opine that her four-day [work] week is already very strenuous and fatiguing for her, and she does not see a time when she will return to five days/40 hour weeks as she did pre-injury. Despite the fact that her immediate supervisor, Dr. Mullen, and employees in their deposition transcripts do not feel that with the new Baptist administration she is at risk of losing her job, they have also opined that Kerry is not the same person and struggles with emotional problems at work, particularly when she is stressed. One of the primary symptoms of TBI is that of a lower tolerance for stress, and the Baptist administration if/when it comes to layoffs will do so based on performance and not seniority. *As such, I am presenting three vocationally probable scenarios regarding Ms. Hogland's future ability to work, and any resulting implications in future earning capacity.* At present, she is still

---

[30] Dr. Marini indicates that he "reviewed the final report of Dr. Dan Johnson dated August 23, 2014." *Doc. 34-1 at 5*. This appears to be a typographical error. Dr. Johnson's "final report" is *dated* November 25, 2014. It is based on his *evaluation* of Hogland on August 23, 2014. *Doc. 36-3 at 69*.

experiencing the loss of one day per week and over $200 per week and reduced earning capacity compared to pre-injury.

*Doc. 34-1 at 14-15* (emphasis added).

In Dr. Marini's "first scenario," Hogland continues to work at her current job as an ultrasound technician, 32 hours per week, until her retirement age of 67. *Doc. 34-1 at 15*. Under this scenario, Hogland loses $204.88 per week/$10,654 per year (based on the eight-hour difference between working forty hours a week and 32 hours a week) "throughout her work life expectancy or retirement age of 67."[31] *Id.*

Dr. Marini's "second scenario considers what I generally observe in persons with moderate brain injury such as Ms. Hogland's who perform skilled work under rigid time pressures . . . [p]ersons with moderate TBI often lose their jobs not because of a lack of skill or performance (although in her case her quality of work has been questioned), but due to emotional problems such as she continues to experience weekly." *Doc. 34-1 at 15*. In the "second scenario," Hogland's "available labor market will be best suited for unskilled or at best low semiskilled work that is low stress, repetitive, and routine[.]" *Doc. 34-1 at 15*. Dr. Marini identifies five available jobs in the Jonesboro area that Hogland "would likely be able to safely engage in from a medical standpoint through her work-life

---

[31] Dr. Marini generally defers to Hogland's expert economist, Dr. Lonnie Talbert, for exact calculations, discounted to present value. Dr. Talbert's expert report projects the loss of future earnings from April 1, 2015, the date the case originally was scheduled for trial. Under "Scenario 1," Dr. Talbert calculates Hogland's lost future earnings, discounted to present value, to be $594,046. *Doc. 32-1 at 9.*

expectancy. After averaging the annual earnings from those five jobs ($22,600), and subtracting that amount from Hogland's pre-injury average annual earnings ($45,114), Hogland's estimated annual wage loss is $22,514 per year, until her retirement age of 67.[32]

Dr. Marini's "third and final scenario . . . assumes that Ms. Hogland, due to emotional lability, will essentially be in and out of the workforce (which is typical for this type of injury), and will more often than not be unemployed throughout her work life expectancy." *Doc. 34-1 at 15-16*. In the "third scenario," Hogland has a complete loss of future earnings, $45,114 per year, not including fringe benefits, until her retirement age of 67.[33]

In the final section of his report, Dr. Marini *speculates* that, if Hogland had not been injured, her skills would have allowed her to attain "career mobility" and she would have moved from Jonesboro to a higher paying job in Memphis or Little Rock. So beings Dr. Marini's attempt to foretell Hogland's future, if she not been injured:   (1) "[O]nce Ms. Hogland's mother unfortunately passes away [from ALS], she [Hogland] may well have moved for the much higher incomes offered for her specialty in [Memphis and Little Rock] while remaining close to home;" and (2)"[I]f one considers the 90th percentile average earnings of ultrasound

---

[32] Under "Scenario 2," Dr. Talbert calculates Hogland's lost future earnings, discounted to present value, to be $752,976. *Doc. 32-1 at 10*.

[33] Under "Scenario 3," Dr. Talbert calculates Hogland's lost future earnings, discounted to present value, to be $1,508,828. *Doc. 32-1 at 8*.

technicians in Little Rock and Memphis respectively, these are $76,700 per year and $74,500 per year. This factor should also be considered as a very real vocational probability for the Hogland family if not for the injury and Kerry taking care of her mother." *Doc. 34-1 at 16.*

In embarking on this speculative odyssey, Dr. Marini seemed utterly undeterred by the fact that *nothing* in the record supports the central assumption for all of his speculation, *i.e.*, if Hogland had not been injured in the accident, she would have later moved from Jonesboro to Memphis or Little Rock to earn a higher salary.[34] *Doc. 35 at 11; doc. 40 at 175.*

Finally, Dr. Marini concludes his Vocational Analysis by opining that, among the future vocational scenarios, the most "vocationally probable" is that Hogland will fall somewhere between his second and third scenarios:

> Overall, it is my opinion within a certain degree of vocational probability and based on consultation with Dr. Johnson as well as noting his August 23, 2014 [sic] final report, although I have laid out three future potential paths for Ms. Hogland, I believe she will be unable to sustain her work as an ultrasound tech and be relegated to a low stress, unskilled or semiskilled job that is repetitive in nature. As such, I would opine that Ms. Hogland will in the future be in and out of the workforce indefinitely as she secures employment for short periods of time, eventually succumbing to the same behavioral and emotional difficulties she has been experiencing since the accident, lose her job, and repeat this cycle until she gives up prior to her work life expectancy. This would then place her future loss

---

[34] Town & Country states that it asked Dr. Marini in his deposition if he had any evidence that Hogland wanted to move to Little Rock or Memphis for a higher-paying job. According to Town & Country, he answered "No . . . I actually never even asked her the question." *Doc. 35 at 11.* The deposition excerpt that Town & Country quotes from is *not* attached to its papers (although it mistakenly states that it is attached as an exhibit). Under this wildly speculative scenario, Dr. Talbert calculates Hogland's lost future earnings, discounted to present value, to be $2,326,084. *Doc. 32-1 at 11.*

of earnings somewhere between a hybrid of [the second and third] scenarios cited above earlier between annual losses of $22,514-$45,114.[35]

*Doc. 34-1 at 16-17.*

Town & Country argues that *all* of Dr. Marini's "scenarios" are inadmissible because they are speculative. As to the first scenario, based on Hogland continuing to work in her current job, thirty-two hours a week, for the remainder of her work life, Town & Country contends it is speculative because: (1) it is based on Hogland's subjective testimony about her future; (2) Dr. Marini ignores the fact that Hogland was taking her son, once a week, to Little Rock for chemotherapy treatments; (3) all evidence indicates that NEA Baptist would allow Hogland to return to full-time work if she elected to do so; and (4) no physician has restricted Hogland from working full time. According to Town & Country, Dr. Marini has "boot-strapped" his first scenario solely on Hogland's self-serving assertions, and there is no evidence to support Dr. Marini's opinion that she can only work 32 hours a week. *Doc. 35 at 6-7.*

Town & Country argues that Dr. Marini's second and third scenarios are speculative because: (1) all of the testimony from Hogland's supervisors and co-workers indicates that she "[is] a qualified and competent employee that [is] in no danger of losing her job;" (2) Hogland has received consistently favorable

---

[35] Under this hybrid scenario, Hogland would work "the equivalent of half time" at an unskilled or semiskilled job. Dr. Talbert calculates Hogland's resulting lost future earnings, discounted to present value, to be $1,130,902. *Doc. 32-1 at 4.*

employee evaluations and pay raises after she returned to work following the accident; (3) Dr. Marini never spoke with any of Hogland's supervisors or co-workers; and (4) Dr. Marini did not know how ultrasound techs at NEA Baptist were evaluated, or how Hogland compared to other ultrasound techs. *Doc. 35 at 8-11*.

Finally, as to Dr. Marini's ruminations about Hogland moving to Little Rock or Memphis for a higher-paying ultrasound tech job, Town & Country points out the obvious — *there is simply no evidence in the record that she ever contemplated making such a move.*

In Hogland's Response, she argues that Dr. Marini's first three scenarios are supported by: (1) her own account of the various ways in which she is "not the way she was before;" (2) Dr. Mullen's testimony that she does not perform or deal with stress as well as she did before the accident, and that her performance ranking among the other ultrasound techs has fallen from being in the "top ten he had ever worked with," before the accident, to now struggling to be "in the top 5 of the 10" ultrasound techs that he currently works with; and (3) other testimony from colleagues Gober, Hubbard, and Denton, all of which supports, to varying degrees, Dr. Marini's second and third scenarios.[36] *Doc. 40 at 12-20.* Additional support for

---

[36] This deposition testimony is summarized in the earlier discussion of Dr. Johnson's recommendation for a vocational rehabilitation assessment, *infra at pp. 22-28.*

those three scenarios can also be found in the testimony and reports of Dr. Johnson.

Hogland's attorneys also represent that, at trial, she will testify about how her ability to work has continued to decline: "Since [Hogland's deposition on May 19, 2014], her vocational situation is noticeably worsened. If a hearing is requested by the Court, Ms. Hogland can [sic] that her memory lapses and her inability to properly focus at work have gotten worse, and are now a substantial problem for her. She is lucky if she can work 32 hours a week[.]"[37] *Doc. 40 at 13*. Her attorneys also represent that: "Dr. Mullen has told [them] that at this point, he would recommend her with reservation for another job . . . [b]efore her injuries, he would have recommended her without reservation. *Doc. 40 at 13*.      Finally,   as to Dr. Marini's fourth scenario, Hogland "proffers" that she will testify at trial "that if she had not been injured, she would have pursued employment in the ultrasound field in Memphis, where she would likely have secured a radiology

---

[37] Hogland adds that, "if the Court is inclined to grant the motion, it requests an evidentiary hearing so that Dr. Marini can fully explain his opinions and methodologies for his vocational scenarios and life care plan, and which are very much in keeping with standard and accepted vocational rehabilitation and life care planning evaluations based on a set of scenarios that the jury must decide . . . [g]iven the enormity of the injuries in this case, Plaintiffs respectfully submit that any doubts [of admissibility] should favor the holding of an evidentiary hearing." *Doc. 40 at 4* (internal citations omitted).

Dr. Marini is an expert witness. His deposition was his opportunity to "fully explain his opinions and methodologies for his vocational scenarios and life care plan." It is far too late for Hogland's counsel to suggest that the Court conduct an evidentiary hearing (less than sixty days before trial) so they can try to shore up or rehabilitate any of the "opinions or methodologies" relied on by Dr. Marini in his December 11, 2014 deposition. As Hogland's counsel undoubtedly knows, the opinions and methodologies expressed or relied on by expert witnesses, are *not* moving targets. Absent extraordinary circumstances, the opinions and methodologies expressed or relied on by expert witnesses in their depositions are *fixed* through trial.

technician job at a far higher salary than what she earned in Jonesboro."[38] *Doc. 40 at 13*.

Under Arkansas law, loss of future earnings and loss of earning capacity must be proved to a reasonable certainty. AMI Civil 2206 (2015). "To prove loss of future earnings, with reasonable certainty, the evidence must show: (1) the amount of wages lost for some determinable period; and (2) the future period over which wages will be lost. However, [the Arkansas Supreme Court] has recognized some latitude in this area and has not insisted on the exactness of proof if it is reasonably certain that some loss has occurred." *Peterrie Transp. Services, Inc. v. Thurmond*, 79 Ark. App. 375, 90 S.W.3d 1 (Ark. App. 2002) (*citing Dr. Pepper Bottling Co. v. Frantz*, 311 Ark. 136, 842 S.W.2d 37 (1992)). In *White Consol. Industries, Inc. v. Thompson*, 2001 WL 419188 (Ark. App. Apr. 25, 2001) (unpublished) (internal citations omitted), the Court succinctly stated the rule governing proof of lost future earnings as follows:

> Loss of earning capacity is the loss of the ability to earn in the future. A serious or permanent injury may sustain the submission of the issue of loss of earning capacity to the jury. Proof of the impairment of the capacity to earn does not, however, require the same specificity or detail as does proof of loss of future wages. The reason is that the jury can observe the appearance of the plaintiff, his age, and the nature of the injuries that will impair his capacity to earn.

---

[38] In her May 19, 2014 deposition, Hogland offered *no testimony* suggesting that, prior to the accident, she planned to move to Memphis, at some future date, in order to secure "a radiology technician job at a far higher salary than what she earned in Jonesboro." Similarly, nowhere in Dr. Johnson's reports, medical notes, or deposition does he mention anything about Hogland sharing with him her pre-accident plan to move to Memphis at some future date to seek "a radiology technician job at a far higher salary." The Court is troubled by the belated suggestion of Hogland's counsel that, at trial, Hogland plans to offer *new testimony* that appears to be tailored to provide some support for Dr. Marini's otherwise utterly unsupported "career mobility" theory. In short, this proposed *new testimony* from Hogland has at least the appearance of being somewhat contrived.

In support of the admissibility of *all* of Dr. Marini's lost earnings scenarios, Hogland cites *Robinson v. Crown Equip. Corp.*, 2007 WL 2819661 (E.D. Ark. Sep. 26, 2007). In that case, United States District Judge Billy Roy Wilson rejected defendant's argument that plaintiff's economist's testimony about lost earnings "was based on speculation, and is therefore, unreliable."

According to Hogland, Judge Wilson "succinctly encapsulates [her] argument" as follows:

> Defendant challenges the reliability of Plaintiff's expert's conclusions and argues that his testimony should be excluded because other evidence does not support the expert's assumptions about Plaintiff's earning and work capacities . . . It is for a jury to decide if Plaintiff is capable of returning to work, and it is for the jury to measure Plaintiff's qualifications. A jury does not need an economist to make these decisions - it is a matter of common sense and weighing witness credibility. Plaintiff's economist has provided alternative computations to assist the jurors to determine the monetary value of Plaintiff's losses, but the jury decides the extent of those losses. The economist is not being called to provide an opinion on Plaintiff's physical abilities and his mental skills-that is a question for rehabilitation experts.

*Id.* at *2-3. Hogland argues that *Crown Equipment* supports her position because "[i]n this case, alternative computations have been made to assist the jury with determining the economic damages claim, assuming the jury finds that [Hogland] is not capable of continuing with her current employment."[39] *Doc. 40 at 3*.

---

[39] Contrary to Hogland's suggestion, Dr. Marini is *not* merely providing lost earnings scenarios to assist the jury. He goes on to opine as to which of those scenarios is the most "vocationally probable." However, as a

Hogland also cites *Mallicoat v. Archer-Daniels-Midland Co.*, 2013 WL 6000097 (E.D. Mo. Nov. 12, 2013) to support her argument. In *Mallicoat* plaintiff's economist calculated his lost future earnings based on the assumption that his injuries limited him to performing only minimum-wage work. However, the economist did not base this assumption "on any objective facts;" did not know the extent of plaintiff's injuries; and was merely asked by plaintiff's counsel to make the assumption. Moreover, plaintiff's deposition testimony indicated that, after his injuries, he continued to perform work at more than the minimum wage, and his vocational expert concluded that he could perform more than minimum wage work. Based on these facts, the trial court *granted* defendant's *Daubert* motion because "the expert's analysis [was] unsupported by the record," and it "offer[ed] no assistance to the jury." *Id.* at *3.

While *nothing* in the court's decision in *Mallicoat* would seem to support any of Hogland's arguments, she explains that it is being cited to *distinguish* its facts from those involved in this action: "The situation before this Court is much different [than *Mallicoat*]: Plaintiffs' economic damages testimony completely coincides and relies upon the vocational scenarios proposed by Dr. Marini." *Doc. 40 at 4.*

---

vocational expert, he appears to be qualified to give that opinion, as long as it is supported by a sufficient foundation.

All of Hogland's arguments beg the narrow question governing the admissibility of Dr. Marini's three scenarios: Are the assumptions relied on by Dr. Marini, as the basis for each of those scenarios, "supported by the record?" Hogland's deposition testimony can be fairly characterized as establishing that, since the accident, she believes she has: (1) reduced ability to handle stress; (2) emotional lability; (3) word confusion; (4) problems in multi-tasking; (5) decreased decision making and confidence; and (6) decreased speed in "processing," sometimes requiring repetition of tasks. Her testimony is supported by the deposition testimony of her co-workers. Additionally, her lawyers have proffered that, at trial, Hogland will testify that she is "noticeably worsened," and Dr. Mullen will testify that he would now only recommend her as an ultrasound tech with "some reservations."

Finally, Dr. Johnson, Hogland's treating neuropsychologist, has expressed his expert opinion that "Hogland's vocational prognosis following her significant traumatic brain injury is likely to be poor," and that "[a]s Ms. Hogland's current vocation struggles continue, as they have despite neurological improvement, the probability of her losing her current job increases exponentially."

Based on this record, the Court concludes that Dr. Marini can testify, as a vocational expert, and express his opinions with regard to the "three vocationally probable scenarios regarding Ms. Hogland's future ability to work, and any

resulting implications in future earning capacity" set forth in his December 2014

"Vocational Assessment." *To be very clear and avoid any future*

*misunderstanding*, *those three scenarios are as follows:*

> (1) Hogland continues to work a four-day (32 hours per week) as an ultrasound technician for the rest of her work-life expectancy, which is her retirement age of 67. *Doc. 34-1 at 15.*

> (2) Hogland is unable to continue to work as an ultrasound technician and finds unskilled or at best low semiskilled work that is low stress, repetitive and routine[.]"[40] *Doc. 34-1 at 15.*

> (3) Hogland's continued "emotional lability [causes her to] be in and out of the workforce . . . and [she] will more often than not be unemployed throughout her work life expectancy." *Doc. 34-1 at 15-16.*

In addition, Dr. Marini can testify about the most vocationally probable scenario

for Hogland, which the Court has labeled his "hybrid" scenario.

However, because there is *no evidence* supporting Dr. Marini's "career

mobility" theory (which is based on his *guess* that, at some future date, Hogland

would have moved to Memphis or Little Rock for a higher paying ultrasound tech

job), his testimony about that theory is far too speculative to be admitted into

evidence.[41]

---

[40] Dr. Marini "assume[s] she [Hogland] would be able to maintain a 40 hour workweek [at unskilled or semi-skilled work] optimistically since the work would be less stressful and within her capabilities; however there are no guarantees." *Doc. 34-1 at 15.*

[41] *Cf. McNamara v. Kmart Corp.*, 2010 WL 56070 (D. Virgin Islands Jan. 5, 2010) (unpublished) (suppressing vocational expert's projection of plaintiff's future loss of income based on plaintiff's "unsubstantiated 'fear' of losing his job and not on any objective medical findings or projections"); *Chesapeake Operating, Inc. v. Hopel*, 2013 WL 5782916 (Tex. Ct. App. Oct. 24, 2013) (trial court erroneously admitted expert testimony from a vocational rehabilitation counselor that the injured plaintiff, an oil drilling engineer, "probably" would have been promoted to a directional driller, a "top paying position" in the industry, because it was speculative — the vocational expert did not account for the cyclical nature of the industry, the expert's testimony about the plaintiff's experience in the industry was contradicted by the plaintiff's own testimony, and the plaintiff's employer testified that someone with plaintiff's background was not reasonably likely to be promoted); *compare with Engles v. City of New Orleans*,

Most, if not all, of the physicians, medical technicians, lawyers, bankers, engineers, school teachers, and other professionals living in the Jonesboro area would have significantly greater "earning potential" if they moved to equivalent jobs in Memphis or Little Rock. They have *elected* not to do so for a host of personal and professional reasons that are *not* related to the "much higher income" they could earn in Memphis and Little Rock. Jonesboro and the surrounding towns, including Pocahontas where Hogland lives, are thriving and have excellent public schools and active churches and other community organizations.

To the extent that Dr. Marini is making a *generalized guess* that most skilled professionals like Hogland inevitably choose to leave Jonesboro, for the greener pastures of Memphis or Little Rock, it certainly is not borne out by the decisions made by the overwhelming majority of professionals working in the Jonesboro area. To the extent Dr. Marini is making a *specific guess* as to Hogland, there is *no evidence* in the record to support that guess.

Incredibly, in Dr. Marini's own deposition, defense counsel asked him if he had any evidence that Hogland wanted to move to Little Rock or Memphis for a higher paying job. He answered: "No . . . I actually never even asked her the

---

872 So.2d 1166, 1182 (La. Ct. App. 2004) (vocational expert's testimony supported the trial court's award of loss of future wages and earning capacity to bicyclist who suffered brain damage in an accident — the victim, a microbiologist in nursing school, testified that he planned to go to medical school — the vocational expert projected the plaintiff's potential earnings in nursing, opined that the plaintiff could have become a "'higher' level microbiologist versus a nurse, or he would attend medical school but expected that plaintiff would eventually lose his current job due to a head injury — he opined that "it is more probable than not, [plaintiff] would have successfully completed medical school, and then he would have 'become a doctor but for the accident.'").

question." *Doc. 35 at 11*. Thus, *by his own admission*, his "career mobility" theory is based solely on *his own speculation* and appears to be designed to inflate, to the maximum extent possible, the amount of Hogland's lost future earnings.

Dr. Marini will *not* be allowed to offer *any testimony* about Hogland's lost future earnings based on the assumption that, if Hogland had not been involved in the August 7, 2012 accident, she would have moved — at some future date — to either Little Rock or Memphis "for the much higher incomes offered by her specialty in [Memphis and Little Rock] while remaining close to home."[42] *Doc. 34-1 at 16*. If Hogland's counsel intends to introduce into evidence Dr. Marini's Vocational Analysis, they must redact that portion of the report that discusses Hogland's alleged future lost earnings based on Dr. Marini's "career mobility" theory.

Finally, Dr. Talbert will not be permitted to testify about Hogland's future lost earnings based on Dr. Marini's "career mobility" theory and any calculations made by Dr. Talbert, for use as trial exhibits, must be redacted so that they contain no calculations of Hogland's future lost earnings based on Dr. Marini's "career mobility" theory.

---

[42] Because Dr. Marini will not be allowed to offer any testimony to support a lost future earnings calculation based on his "career mobility" theory, this makes Hogland's proffered new testimony supporting this theory irrelevant and inadmissible under Fed. R. Evid. 401. Additionally, without any expert testimony from Dr. Marini on his "career mobility" theory for calculating Hogland's damages, her testimony, standing alone, would create confusion and might well mislead the jury on her properly recoverable lost wages. *See* Fed. R. Evid. 403.

For the foregoing reasons, Town & Country's Motion in Limine and *Daubert* Motion are granted only as to the final section of Dr. Marini's Vocational Analysis, which assumes Hogland's "career mobility" would have led her to a higher paying job in Memphis or Little Rock. Those Motions are denied as to the other work scenarios for Hogland described in Dr. Marini's Vocational Analysis. *See Doc. 34-1 at 14-15*.

### 3.   Dr. Marini's Life-Care Plan

Dr. Marini's Life-Care Plan consists of the following items:

- "Projected Evaluations" with total "one time costs" of $1,280. The "Projected Evaluations" consist of: (1) a psychological evaluation ("one time cost" of $280); and (2) a vocational assessment battery ("one time cost" of $1,000). *Doc. 34-1 at 19.*

- "Projected Therapeutic Modalities" with total "one time costs" of $17,400, and "annual costs" of $4,020. The "Projected Therapeutic Modalities" consist of: (1) psychotherapy with Dr. Susan Gibbard of Jonesboro with a "one time only cost" of $5,460 — $140 per hour for "weekly sessions for six months, then twice per month for six months;" (2) psychotherapy thereafter for twelve sessions a year, for the remainder of Hogland's life expectancy, with an annual cost of $1,680; (3) monthly visits to a psychiatrist for medication management, throughout 2015, with a "one time cost" of $2,700 — $225 per office visit; (4) quarterly visits to a psychiatrist, from 2016 through the remainder of Hogland's life expectancy, with a cost of "$900 per year;" and (5) speech language therapy throughout Hogland's life expectancy, "twice per week for nine months then once per month for life at $120 per hour," with "one time costs" of $9,240, and "annual costs" of $1,440. Doc. 34-1 at 20.

- "Home/Facility Care" with total "one time costs" of $13,340. "Home/Facility Care" consists of: (1) past loss of home-health assistance for August 25, 2012 through December 15, 2012, with a "one time costs" of $9,280; and (2) "daily home care assistance" in 2015 "4 hours per day for 3 months during her work week so 70 days x 4 x $14.50 hr" for a "one time cost" of $4,060. *Doc. 34-1 at 21.*

- "Drug/Supply Needs" with total "annual costs" of $2,494. "Drug/Supply Needs" consist of: (1) seizure medication with an annual cost of $243; and (2) depression medication with an annual cost of $2,251. *Doc. 34-1 at 22.*

- "Future Medical Care – Routine Evaluations" with a cost "TBD" [to be determined]. "Future Medical Care – Routine Evaluations" consist of: (1) a visit to a neurologist "likely once per year for life;" and (2) "MRI, CT, and/or brain x-rays" at an "unknown" frequency. Doc. 34-1 at 23.

*Doc. 34-1 at 18-24.*

In Town & Country's Motion in Limine and *Daubert* Motion, it argues that Dr. Marini's Life-Care Plan is inadmissible because he is not a medical doctor and his Life-Care Plan is based on either his unqualified opinions or the unqualified opinions of Dr. Johnson.[43] *Doc. 35 at 4-5.* Dr. Marini, by education, training, and experience, is a vocational and rehabilitation expert, as well as a "certified life care planner." As such, he is qualified to prepare a Life-Care Plan, as long as he properly relies on the opinions of other experts (in this case mainly Dr. Johnson) for items in the plan that are outside his fields of expertise. This appears to be precisely what Dr. Marini did in preparing the Life-Care Plan.[44]

Consistent with the Court's earlier rulings on the admissibility of Dr. Johnson's recommendations, it will grant Town & Country relief as to the item (5) "speech language therapy" in the "Projected Therapeutic Modalities" section of Dr.

---

[43] In its Reply, Town & County clarifies it "does not argue that a life care planner or his/her testimony is inherently inadmissible. Rather, defendant's argument is that a life care planner cannot testify to future medical treatments without having competent evidence to verify and validate the proposed treatments." *Doc. 41 at 2-3*. Town & Country also concedes the admissibility of one portion of the life care plan, anti-seizure medication, which has been prescribed by Hogland's treating neurologist, Dr. Chan. *Doc. 35 at 5*.

[44] The Life-Care Plan obviously tracks closely the recommendations made by Dr. Johnson in his November 25, 2014 report.

Marini's Life-Care Plan. As to the other items of care or support set forth in the sections of Dr. Marini's Life-Care Plan (captioned "Projected Evaluations," "Projected Therapeutic Modalities," "Home/Facility Care," and "Drug/Supply Needs") the Court's earlier rulings make it clear that Dr. Johnson, as a neuropsychologist, is qualified to opine on Hogland's need for those future items of care, as set forth in his November 25, 2014 report. Accordingly, there is no basis for excluding those sections of Dr. Marini's Life-Care Plan or his testimony about them.

Nonetheless, there is a serious problem with the last section of Dr. Marini's Life-Care Plan, captioned "Future Medical Care – Routine Evaluations," which projects Hogland's future needs for neurology visits and brain imaging. Dr. Marini admits that Dr. Chan, Hogland's neurologist, has *not* provided him with any of the pertinent information he needs to complete this section of the plan. As a result, in this section of the Life-Care Plan, Dr. Marini notes that any future neurological care and the related costs of that care are "TBD" — "to be determined."

Town & Country's argues that it was Hogland's obligation to obtain evidence from Dr. Chan to support this section of Dr. Marini's Life-Care Plan "before the discovery deadline passed." *Doc. 41 at 8*. Town & Country also suggests that it is probable no such evidence exists because, if it did, "it would [already] be before the Court." *Id.*

In Hogland's Response, she argues that:

> Dr. Chan, as a treating physician, is not required to provide information to forensic experts on either side of the case. When he testifies at trial, he will provide his recommendations. Experts on both sides can react to his testimony.

*Doc. 40 at 32*. Hogland cites *no legal authority* to support her position, which is contrary to Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure.

It was Hogland's obligation to provide Dr. Marini with Dr. Chan's opinion on her need for "future neurology visits and brain imaging" *before* Dr. Marini prepared his Life-Care Plan and *before* the discovery cut-off deadline. Because she failed to do so, there is *no medical evidence* in the record to support Hogland's need for future "neurology visits" and future "MRI, CT, and/or brain x-rays." Thus, there is no evidence in the record to support the final section of Dr. Marini's Life-Care Plan relating to "Future [Neurological] Medical Care – Routine Evaluations."

Accordingly, Town & Country's Motion in Limine and *Daubert* Motion are granted and neither Dr. Marini nor Dr. Chan will be allowed to testify about Hogland's future need for any neurological medical care or any of the related medical costs. If Hogland's counsel intends to introduce into evidence Dr. Marini's Life-Care Plan, they must *redact*: (1) Item (5) "speech language therapy" from the section of the Life-Care Plan captioned "Projected Therapeutic Modalities;" and (2) *everything* in the final section of the Life-Care Plan, which is captioned "Future

Medical Care – Routine Evaluations." The remainder of the relief sought by Town & Country's Motion in Limine and *Daubert* Motion on Dr. Marini's Life Care Plan, is denied.

### C.  Town & Country's Motion in Limine and *Daubert* Motion to Exclude the Testimony of Dr. Lonnie Talbert

Dr. Lonnie Talbert is Hogland's expert economist. On December 5, 2014, he prepared a "Report of Economic Damages Related To: Lost Earnings and Life Care Plan." *Doc. 32-1*. He later prepared an Addendum dated December 12, 2014. In those documents, Dr. Talbert projects: (1) Hogland's lost past earnings; (2) the present value of Hogland's lost future earnings; (3); the present value of Hogland's lost future fringe benefits; and (4) the present value of Dr. Marini's Life-Care Plan.[45] *Id.*

Dr. Talbert projects and calculates Hogland's loss of future earnings as follows:

> (1) In "Exhibit D," *doc. 32-1 at 9*, Dr. Talbert assumes Hogland's ability to continue to work in her present capacity of 32 hours a week, losing 8 hours a week (in addition to losing her part-time work at Five Rivers), through her work-life expectancy for a present value of $594,046. This corresponds to Dr. Marini's "scenario 1" where Hogland continues to work a four-day (32 hours per week) as an ultrasound technician for the rest of her work-life expectancy.

> (2) In "Exhibit E," *doc. 32-1 at 10*, Dr. Talbert assumes Hogland loses her current job but finds alternative full-time unskilled/semi-skilled work, through her work-life expectancy for a present value of $752,976.[46] This corresponds to Dr.

---

[45] All of Dr. Talbert's future lost earnings projections assume that Hogland's loss begins on April 1, 2015, the date this case originally was scheduled for trial. Obviously, Dr. Talbert must amend all his future lost earnings calculations to reflect the new trial date of August 10, 2015.

[46] In Dr. Talbert's December 5, 2014 report, he also makes a future lost earnings calculation assuming that Hogland can only work "the equivalent of half time" unskilled or semi-skilled work. The present value of this

Marini's "scenario 2," where Hogland is unable to work as an ultrasound technician and finds unskilled or at best low semiskilled work that is low stress, repetitive and routine.

(3) In "Exhibit C," *doc. 32-1 at 8*, Dr. Talbert assumes Hogland's inability to work through her work-life expectancy for a present value of $1,508,828. This corresponds to Dr. Marini's "scenario 3" where "emotional lability [causes Hogland to] be in and out of the workforce . . . and [she] will more often than not be unemployed throughout her work life expectancy."[47]

(4) In "Exhibit F," *doc. 32-1 at 11*, Dr. Talbert assumes Hogland has lost future earning capacity, through her work-life expectancy, based on the earning potential for ultrasound technicians in Memphis and Little Rock, for a present value of $2,326,084. This corresponds to Dr. Marini's "career mobility" theory, which is based on his assumption that, if Hogland had not been injured in the accident, she would have moved to Memphis or Little Rock for a higher-paying job.

Town & Country argues that *all* of Dr. Talbert's projections of Hogland's lost future earnings and fringe benefits are inadmissible because they are based on lost future earnings scenarios provided by Dr. Marini in his "Vocational Analysis." Consistent with the Court's earlier ruling on the admissibility of Dr. Marini's various loss of future earnings scenarios, Town & Country's Motion in Limine and *Daubert* Motion are granted only as to Dr. Talbert's "Exhibit F" calculations, which are based on Dr. Marini's "career mobility" theory.

Finally, Town & Country argues that Dr. Talbert's calculations on Hogland's *past* lost wages are inadmissible because those damages are within the jury's common knowledge and "the jury does not need an economist to tell it how

---

calculation is $1,130,902. *Doc. 32-1 at 4*. This appears to be a projection of Dr. Marini's "hybrid scenario" of the most "vocationally probable" result for Hogland, a range between his second and third scenarios.

[47] In Dr. Talbert's December 5, 2014 report, he indicated that he did not yet have the information he needed from NEA Baptist to calculate Hogland's loss of future fringe benefits in the event she lost her job there and could not obtain equivalent work. *Doc. 32-1 at 4*. On December 12, 2014, he issued an Addendum that calculated the present value of lost future health insurance premium contributions as $401,620; and (2) the present value of lost future retirement contributions as $72,619. *Doc. 32-2*.

to perform basic arithmetic." *Doc. 33 at 18*. While the math involved in computing Hogland's past lost wages may be "basic," it still would be helpful for the jury to have an economist illustrate this calculation. Thus, Town & Country's Motion In Limine and *Daubert* Motion to exclude Dr. Talbert's calculation of Hogland's past lost earnings are denied.[48]

### IV. Conclusion

IT IS THEREFORE ORDERED THAT:

1.       Town & Country's Motion in Limine and *Daubert* Motion to Exclude Certain Testimony of Dan Johnson, Ph.D. (*doc. 36*) are GRANTED, IN PART, and DENIED, IN PART. Town & Country's Motion in Limine and *Daubert* Motion are GRANTED only as to Dr. Johnson's third recommendation, for speech therapy, contained in his November 25, 2014 Report. The remainder of Town & Country's Motion in Limine and *Daubert* Motion is DENIED.

2.       Town & Country's Motion in Limine and *Daubert* Motion to Exclude Testimony of Dr. Irmo Marini, Ph.D. (*doc. 34*) are GRANTED, IN PART, and DENIED, IN PART. Town & Country's Motion in Limine and *Daubert* Motion are GRANTED as to: (1)  Dr. Marini's "career mobility" theory as a basis for calculating Hogland's future lost earnings; (2) item (5) "speech language therapy" in the section of Dr. Marini's Life-Care Plan captioned "Projected Therapeutic

---

[48] Town & Country does not make any argument addressing the admissibility of Dr. Talbert's calculation of the present value of Dr. Marini's Life-Care Plan. However, at trial, Hogland's attorneys must ensure that Dr. Talbert's calculations do *not* include any of the items of Dr. Marini's Life-Care Plan that the Court has excluded.

Modalities;" and (3) *everything* in the final section of Dr. Marini's Life-Care Plan captioned "Future Medical Care – Routine Evaluations." The remainder of Town & Country's Motion in Limine and *Daubert* Motion is DENIED.

3.     Town & Country's Motion in Limine and *Daubert* Motion to Exclude Testimony of Dr. Lonnie Talbert, Ph.D. (*doc. 32*) are GRANTED, IN PART, and DENIED, IN PART. Town & Country's Motion in Limine and *Daubert* Motion are GRANTED as to Dr. Talbert's calculation of Hogland's future lost earnings based on Dr. Marini's "career mobility" theory. The remainder of Town & Country's Motion in Limine and *Daubert* Motion is DENIED.

Dated this 22nd day of June, 2015.

_____

UNITED STATES MAGISTRATE JUDGE